**No. 25-11206**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

ELITE PRECISION CUSTOMS L.L.C.; TIM HERRON; FREDDIE BLISH; FIREARMS POLICY COALITION, INCORPORATED, A NONPROFIT CORPORATION,

*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; PAMELA BONDI, U.S. ATTORNEY GENERAL; DANIEL DRISCOLL, ACTING DIRECTOR, U.S. BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

*Defendants-Appellees*.

---

On Appeal from the United States District Court for the Northern District of Texas, Case No. 4:25-cv-44, the Honorable Mark Timothy Pittman

---

## BRIEF OF PLAINTIFFS-APPELLANTS

---

Cody J. Wisniewski
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, Nevada 89149
Telephone: (615) 955-4306
Facsimile: (615) 334-0463
cwi@fpcafhq.org

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

*Elite Precision Customs, LLC v. BATFE*, No. 25-11206

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal. Additionally, Elite Precision Customs, LLC and Firearms Policy Coalition, Inc. are nongovernmental corporations. Neither has a parent corporation and nor does any publicly held corporation own 10% or more of the stock of either.

1. **Plaintiffs-Appellants:**

   **Elite Precision Customs L.L.C.; Tim Herron; Freddie Blish; Firearms Policy Coalition, Incorporated, a nonprofit corporation**

   Counsel:

   David H. Thompson
   Peter A. Patterson
   William V. Bergstrom
   COOPER & KIRK, PLLC
   1523 New Hampshire Ave., N.W.
   Washington, D.C. 20036
   Telephone: (202) 220-9600
   Facsimile: (202) 220-9601
   dthompson@cooperkirk.com

i

ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

Cody J. Wisniewski
FPC Action Foundation
5550 Painted Mirage Road
Suite 320
Las Vegas, Nevada 89149
Telephone: (615) 955-4306
Facsimile: (615) 334-0463
cwi@fpcafhq.org


2.    **<u>Defendants-Appellees</u>:**

**Bureau of Alcohol, Tobacco, Firearms, and Explosives;
Pamela Bondi, U.S. Attorney General; Daniel Driscoll,
Acting Director, U.S. Bureau of Alcohol, Tobacco,
Firearms, and Explosives**


<u>Counsel</u>:

Sean Janda
U.S. Department of Justice
Civil Division, Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
sean.r.janda@usdoj.gov

Samuel Bean
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20005
(202) 405-9619
samuel.b.bean2@usdoj.gov

## 3.    <u>District Court Participants:</u>

James R McHenry, III, in his official capacity as Acting Attorney General of the United States

Marvin G. Richardson, in his official capacity as the Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives

*Defendants*

R. Brent Cooper
Cooper & Scully PC
900 Jackson Street, Suite 100
Dallas, TX 75202
Telephone: (214) 712-9501
Fax: (214) 712-9540
brent.cooper@cooperscully.com

*Counsel for Plaintiffs*

Andrew Warden
1100 L St NW
Suite 7301
Washington, DC 20005
(202) 616-5084
andrew.warden@usdoj.gov

*Counsel for Defendants*

Hon. Mark Timothy Pittman

*District Court Judge*

/s/ David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument. This case satisfies the standards for allowing oral argument set forth in Fed. R. App. 34(a)(2). First, this appeal is not frivolous. As explained in this brief, the challenged ban on interstate transfers of handguns cannot be squared with the fundamental right to keep and bear arms protected by the Second Amendment to the United States Constitution. Second, although this Court has previously rejected a challenge to this same set of restrictions, *see Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018), that decision was abrogated by *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). This issue has not been authoritatively decided following *Bruen*. Finally, Plaintiffs-Appellants respectfully submit that the decisional process on the important matters presented in this case would be significantly aided by oral argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ............................................. i

STATEMENT REGARDING ORAL ARGUMENT ................................. iv

TABLE OF AUTHORITIES ................................................................. vi

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUE PRESENTED ......................................................................... 1

INTRODUCTION .............................................................................. 2

STATEMENT OF THE CASE ............................................................. 3

   I.    The Interstate Handgun Purchase Ban ...................................... 3

   II.   The Ban's Effect on Plaintiffs. ................................................ 7

   III.  Procedural History. ................................................................. 9

SUMMARY OF THE ARGUMENT ...................................................... 11

ARGUMENT .................................................................................... 13

   I.    Legal Standard. ..................................................................... 13

   II.   The District Court Erred In Holding the Ban Does Not Implicate the Second Amendment's Plain Text ............................................. 14

   III.  The Ban Is a Historical Aberration Inconsistent with the Right to Keep and Bear Arms. ............................................................... 32

CONCLUSION ................................................................................. 52

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Andrews v. State,*
    50 Tenn. (3 Heisk.) 165 (1871)................................................................16

*B&L Prods., Inc. v. Newsom,*
    104 F.4th 108 (9th Cir. 2024)...........................................................15, 18

*Boynton v. Kusper,*
    494 N.E.2d 135 (Ill. 1986) ....................................................................28

*Carey v. Population Servs., Int'l,*
    431 U.S. 678 (1977) ...............................................................................28

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ...................................2, 11, 14, 15, 16, 17, 21,
                                                                                    28, 29, 30, 31, 44, 45, 46

*Gibbons v. Ogden,*
    22 U.S. (9 Wheat.) 1 (1824) .................................................................47

*Grosjean v. Am. Press Co.,*
    297 U.S. 233 (1936) ...............................................................................27

*Harper v. Va. State Bd. of Elections,*
    383 U.S. 663 (1966) ...............................................................................28

*Hughes v. Oklahoma,*
    441 U.S. 322 (1979) .........................................................................46, 47

*Ill. Ass'n of Firearm Retailers v. City of Chicago,*
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ..................................................16

*Jackson v. City & County of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ...............................................................15

*Luis v. United States,*
    578 U.S. 5 (2016) .............................................................................14, 19

*Mance v. Holder,*
    74 F. Supp. 3d 795 (N.D. Tex. 2015)..............................................4, 6, 7

*Mance v. Sessions,*
    896 F.3d 699 (5th Cir. 2018) .......................................................i, 4, 20

*McCulloch v. Maryland,*
   17 U.S. 316 (1819) ............................................................... 19

*McRorey v. Garland,*
   99 F.4th 831 (5th Cir. 2024)......................................... 10, 24, 25, 26

*New York State Rifle & Pistol Association v. Bruen,*
   597 U.S. 1 (2022) ..........................i, 3, 10, 13, 15, 16, 19, 20, 21, 22,
                                         25, 27, 31, 32, 34, 36, 41, 45, 46

*Nguyen v. Bonta,*
   140 F.4th 1237 (9th Cir. 2025)...................................................... 52

*Reese v. BATFE,*
   127 F.4th 583 (5th Cir. 2025).... 12, 14, 15, 16, 23, 24, 26, 31, 33, 34

*Teixeira v. County of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ........................................................ 15

*United States v. Daniels,*
   77 F.4th 337 (5th Cir. 2023)......................................................... 17

*United States v. Daniels,*
   144 S. Ct. 2707 (2024) (mem.)................................................. 17, 18

*United States v. Hembree,*
   No. 24-60436, 2026 WL 217125 (5th Cir. Jan. 27, 2026)......... 31, 33

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010)........................................................... 16

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000) .................................................................... 22

*United States v. Rahimi,*
   602 U.S. 680 (2024) .......................................................................2

*United States v. Williams,*
   113 F.4th 637 (6th Cir. 2024)....................................................... 30

## <u>Statutes, Codes, and Constitutional Provisions</u>

U.S. CONST. amend. II ................................................................2, 14

18 U.S.C.
   § 922(a)(3) ................................................................................. 4, 27
   § 922(a)(3)(A) .................................................................................5

§ 922(a)(5) ....................................................................................... 4
§ 922(a)(5)(A) ................................................................................. 5
§ 922(b) ......................................................................................... 27
§ 922(b)(3) ................................................................................. 4, 5
§ 922(g)(1) ...................................................................................... 5
§ 922(t) ............................................................................................ 6
§ 926(a) ........................................................................................... 5
§ 1715 ........................................................................................... 28

27 C.F.R. § 478.99(a) .............................................................................. 5

28 C.F.R.
§ 25.1 ............................................................................................. 6
§ 25.2 ............................................................................................. 6
§ 25.6(d) ......................................................................................... 6

Constitutionality of 18 U.S.C. § 1715, 49 Op. O.L.C.
(Jan. 15, 2026) (slip op.) ........................................................ 28, 29

## Other Authorities

Act of Feb. 21, 1631, *in* 1 WILLIAM WALLER HENING, STATUTES AT
LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA
(New York, R. & W. & G. Bartow 1823),
https://perma.cc/M4YT-BXQA ................................................. 34, 44

Act of Feb. 12, 1719, *in* 3 THOMAS COOPER, THE STATUTES AT LARGE
OF SOUTH CAROLINA (Columbia, A.S. Johnston 1838),
https://perma.cc/83KF-YNBZ ....................................................... 42

Act of Dec. 1775, *in* 11 THE PUBLIC RECORDS OF THE COLONY OF
CONNECTICUT (Charles J. Hoadly ed., Hartford, Case, Lockwood
& Brainard Co. 1890), https://perma.cc/3QWS-ZPJA .................... 41

Act of Apr. 18, 1795, ch. 1846, *in* 3 LAWS OF THE COMMONWEALTH OF
PENNSYLVANIA (Phila., John Bioren 1810),
https://perma.cc/SD65-EBN6 .................................................. 36, 37

Act of Feb. 7, 1811, 1811 N.J. Laws 300, § 1, *in* LAWS OF THE STATE
OF NEW-JERSEY (Trenton, Joseph Justice 1821),
https://perma.cc/3N3H-U38U ....................................................... 38

Act of Feb. 28, 1814, ch. 192, § 2, *in* 6 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS (Bos., Russell, Cutler & Co. 1812–15), https://perma.cc/6V4Q-YN2S ....................................................... 39

Act of June 21, 1820, ch. 24, § 2, *in* 8 LAWS OF NEW HAMPSHIRE (Concord, Evans Printing Co. 1920), https://perma.cc/LHC5-AATL ....................................................... 38

Act of Mar. 10, 1821, ch. 162, § 3, *in* 2 LAWS OF THE STATE OF MAINE (Francis O. J. Smith ed., Portland, Thomas Todd & Colman, Holden & Co. 1834), https://perma.cc/T9BN-XRXE........................ 39

Br. of United States as *Amicus Curiae*, *Granata v. Campbell*, No. 25-1918 (1st Cir. Jan. 28, 2026) ............................. 14, 15, 22, 24

COLONIAL LAWS OF MASSACHUSETTS (Bos., 1887), https://perma.cc/8JYU-46MH ....................................................... 40

THE FEDERALIST NO. 11 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)................................................................. 47

THE FEDERALIST NO. 42 (James Madison) (Jacob E. Cooke ed., 1961)... 47

The First Code of Laws, May 1650, *in* TRUE-BLUE LAWS OF CONNECTICUT AND NEW HAVEN AND THE FALSE BLUE LAWS (J. Hammond Trumbull ed., Hartford, 1876), https://perma.cc/H4QJ-BXY8................................................. 49, 50

2 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA (New York, R. & W. & G. Bartow 1823), https://perma.cc/9QB8-QW4Y.................. 50, 51

LAWS AND ORDINANCES OF NEW NETHERLAND (E.B. O'Callaghan ed., Albany, Weed, Parsons & Co. 1868), https://perma.cc/9SYQ-QG8H ....................................................... 51

PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND (Balt., James Lucas & E.K. Deaver 1836), https://perma.cc/4AEL-NB5A ....................................................... 43

Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J.L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://perma.cc/F98Y-3D32.............. 33

Edward St. Germain, *Bacon's Rebellion of 1676*, AMERICANREVOLUTION.ORG, https://perma.cc/5NDF-DLWG........ 50

J. HAMMOND TRUMBULL, PUBLIC RECORDS OF THE COLONY OF
CONNECTICUT (Hartford, Brown & Parsons 1850),
https://perma.cc/XQ6Y-FMU7.................................................. 34, 48

WAVERLY K. WINFREE, BEING A SUPPLEMENT TO HENING'S
THE STATUTE'S AT LARGE (1971) .................................................... 42

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, because Plaintiffs claim arises under federal law. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, because this appeal is from a final judgment that disposed of all parties' claims. The district court entered judgment on September 30, 2025, and Plaintiffs timely noticed this appeal on October 28, 2025.

## ISSUE PRESENTED

Whether federal laws that ban individuals residing in one state from acquiring a handgun directly from dealers in another state violate the Second Amendment to the United States Constitution.

## INTRODUCTION

The Second Amendment to the United States Constitution protects the "right of the people to keep and bear Arms." U.S. CONST. amend. II. That right is implicated here because the laws challenged by Plaintiffs, which make it impossible for them to purchase handguns outside of their states of residence, undeniably "regulate[] arms-bearing conduct." *United States v. Rahimi*, 602 U.S. 680, 691 (2024). That means that the Government only can prevail if it can justify its ban by reference to the historically recognized limits on the scope of the right. *Id.*

The district court never reached the question of whether the Government had carried this burden, however, because it concluded that the "plain text" of the Second Amendment does not extend to cover regulations, such as this one, which impose "conditions and qualifications on the commercial sale of arms," *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008), but which do not amount to an "infringement" of the right. This was wrong. Whether a regulation "infringes" the right is not a question, as the district court took it to be, of the textual scope of the word "infringe" that invites the Court to ask whether the law imposes a significant burden that is justified by the government's aims in imposing

it. That is precisely the mode of analysis that the Supreme Court rejected in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). Rather, whether a regulation "infringes" the right is *the* question to be answered, under *Bruen*, through an analogical comparison to historical limitations on the right. The district court's alternative approach is antithetical to the decisions of the Supreme Court and of this Court.

Rejecting the district court's approach clarifies greatly the task for this Court, which is only to ask: is the ban on interstate handgun transfers historically justified? The only possible answer to that question is no. At no point in our country's history prior to the 20th century was the acquisition of firearms restricted in this way. This Court should reverse and remand with instruction to grant Plaintiffs' motion for summary judgment.

## STATEMENT OF THE CASE

### I.    The Interstate Handgun Purchase Ban.

Federal law makes it illegal for a peaceable American, who is not prohibited for any reason from possessing firearms, to purchase and take possession of handguns from a licensed firearm dealer across state lines.

First, federal law "forbid[s] individuals from transporting into or receiving in their state of residency any firearm acquired outside of that state, except for firearms acquired by bequest or intestate succession." *Mance v. Holder*, 74 F. Supp. 3d 795, 799 (N.D. Tex. 2015), *rev'd sub nom.*, *Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) (per curiam) (applying pre-*Bruen* interest balancing to reject a Second Amendment challenge to the law). These restrictions are codified in 18 U.S.C. § 922. Subsection (a)(3) makes it illegal "for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides … any firearm purchased or otherwise obtained by such person outside that State." 18 U.S.C. § 922(a)(3). Subsection (a)(5) prohibits the transfer, sale, or delivery firearms from a transferor "to any person … who the transferor knows or has reasonable cause to believe does not reside in … the State in which the transferor resides[.]" *Id.* § 922(a)(5). And subsection (b)(3) makes it unlawful for licensed dealers to "sell or deliver … any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in … the State in which the licensee's place of business is located." *Id.* § 922(b)(3). This provision applies only to sales of handguns,

4

because sales of rifles and shotguns are excepted so long as "the transferee meets in person with the transferor to accomplish the transfer" and the sale "fully compl[ies] with the legal conditions of sale in both" the transferee and transferor's states. *Id.* Federal regulation imposes the same restrictions on transfers from licensed dealers. *See* 27 C.F.R. § 478.99(a); *see also* 18 U.S.C. § 926(a) (authorizing such rulemaking). There are other exceptions to the transfer restrictions not at issue in this case; for instance, firearms acquired through bequest or intestate succession can be acquired across and transferred across state lines. 18 U.S.C. § 922(a)(3)(A), (a)(5)(A). But those exceptions do not provide any means for an ordinary American directly to purchase a handgun from a licensed dealer outside of his or her home state.

These requirements, collectively the "Nonresident Handgun Purchase Ban" or "the Ban," are distinct from the many other restrictions Congress has placed on the transfer of handguns, including bans on purchase of handguns by certain disqualified individuals, *see, e.g.*, *id.* § 922(g)(1) (banning purchase of firearms by individuals convicted of a crime punishable by more than one year in prison), or the requirement that licensed dealers must run a background check on any potential

5

purchaser to ensure that he is legally eligible to possess firearms and ammunition and does not belong to any category of disqualified individuals, *see id.* § 922(t); 28 C.F.R. §§ 25.1–.2, 25.6(d).

The upshot of this legal landscape is that Americans cannot directly acquire handguns from any licensed dealer except for those located in their home states. A person traveling outside of his or her state of residence who wishes to acquire a handgun from a licensed dealer for immediate lawful use simply is out of luck. Nor can a person purchase a handgun directly from a licensed dealer in another state for use at home. Rather, a buyer from Texas (for example) cannot purchase a handgun from a dealer in Oklahoma unless the dealer in Oklahoma transfers it first to a different dealer in Texas who is willing to facilitate the transaction. This regime effectively gives in-state dealers a veto on the ability of residents of their state to take their business to another and buy firearms from out-of-state competitors. Unsurprisingly, this manifests functionally as both a logistical and monetary tax on the right to keep and bear arms, as not all retailers will agree to perform interstate transfer services, and those that do typically charge a significant fee for the privilege. *See Mance*, 74 F. Supp. 3d at 807 ("To obtain a handgun

from an out-of-state FFL retailer, the federal interstate handgun transfer ban imposes substantial additional time and expense to those who desire to purchase one.").

## II.    The Ban's Effect on Plaintiffs.

The Plaintiffs in this case are one federally licensed firearms dealer, Elite Precision Customs LLC, located in Mansfield, Texas, two individuals, Tim Herron and Freddie Blish, residents of New Mexico and Arizona respectively, and one organization, Firearms Policy Coalition, a nonprofit membership organization that counts Elite Precision Customs, Herron, and Blish among its members across the country who are adversely affected by the Ban.

Elite Precision Customs is a federally licensed dealer and gunsmith located in Texas. ROA.219. Texas does not independently bar Elite Precision from selling handguns to out-of-state purchasers and Elite Precision would, if not for the Ban, and in compliance with all other federal and state laws regulating the transfer of firearms, sell handguns to individuals who reside in states other than Texas. ROA.220. Two of those individuals are Herron and Blish. Herron is a competitive shooter and firearms trainer who teaches firearms classes across the country.

ROA.225. He travels frequently all over the country to conduct these trainings, and he regularly teaches at ranges that double as licensed firearms dealers. ROA.225. He has, many times in the past, found a handgun while on the road that he would have purchased, were it not for the Ban. ROA.225–26. Indeed, he has on occasion chosen to purchase a handgun even though he is traveling and routed the transaction through a dealer located in Albuquerque, New Mexico. ROA.226. In doing so he has experienced delays in acquiring the firearm and incurred an additional cost of $30–40 dollars to pay for the local dealer's facilitation of the transaction. *Id.* Herron teaches classes in Texas, and he would, if not for the Ban, purchase a handgun from Elite Precision in Texas. ROA.225–26.

Blish is also a firearms instructor who teaches classes in handgun self-defense in many states around the country, including in Texas. ROA.221. When traveling for work, Blish frequently shops for firearms and he would, if not for the Ban, occasionally purchase a handgun directly from an out-of-state dealer. ROA.221–22. Blish has never done so, however, because the Ban has prevented him from acquiring a firearm

8

in this way. ROA.221–22. Were it not for the ban, Blish would acquire a handgun directly from Elite Precision. ROA.222.

FPC is a membership organization that seeks to create a world of maximal human liberty and freedom, including by defending and advancing the inalienable, fundamental, and individual right to keep and bear arms. ROA.223. It has members across the country, including Blish and Herron, who are peaceable, responsible citizens who desire to and do purchase handguns for lawful purposes including self-defense. ROA.223. These members, including Blish and Herron, would, if not for the Ban, occasionally acquire handguns from dealers located outside of their home states, and without incurring the delays and costs entailed by the Ban. ROA.223–24. Others of FPC's members, like Elite Precision, would *sell* firearms to such individuals, but for the Ban. ROA.224. FPC brings this suit on behalf of its members. ROA.224.

## III.    Procedural History.

Plaintiffs filed this lawsuit on January 20, 2025, alleging that the Ban violates their rights, and FPC's members' rights, to acquire handguns under the Second Amendment to the Constitution. *See* ROA.10–11. The parties agreed, given the purely legal issues raised by

9

Plaintiffs' challenge, to forego discovery and to resolve this case through dispositive motions. ROA.141–42. The Government moved to dismiss, *see* ROA.156, and Plaintiffs cross-moved for summary judgment, *see* ROA.180.

On September 30, 2025, the district court granted the Government's motion and denied Plaintiffs' because it concluded that the Ban "do[es] not regulate conduct that falls within the 'plain text of the Second Amendment.'" ROA.261 (quoting *Bruen*, 597 U.S. at 24). In reaching that conclusion, the district court held that, "as a necessary predicate to the right to keep and bear arms, the right of acquisition is protected, too, particularly when the prohibitions turn 'into functional prohibitions on keeping.' If it were not, the plain text of the Second Amendment would be stripped of all substance." ROA.262 (quoting *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024)) (citation omitted). Based on this assessment, it reframed the task before it as deciding whether the Ban constituted a "presumptively lawful regulatory measure[]," or serves as "a de facto prohibition on possession." ROA.262–63 (citations omitted). It held that the Ban was the former, because "[w]hen a condition on sale incurs a slight delay on possession and

10

increased cost as here, the Second Amendment is not implicated." ROA.263.

## SUMMARY OF THE ARGUMENT

The district court erred in holding that the Ban's restrictions on purchasing and receiving handguns across state lines do not implicate the "plain text" of the Second Amendment. Under binding precedent from the Supreme Court and this Court, the plain text of the Second Amendment *must* be implicated here because the Ban restricts the acquisition of firearms and acquiring firearms is, at least, fairly implied by the Constitution's explicit protection of "keeping" and "bearing" them.

The district court's contrary conclusion was built on a misunderstanding of *Heller* and of the scope of the textual analysis itself. Focusing on *Heller*'s reference to "conditions and qualifications on the commercial sale of arms" as "presumptively lawful," 554 U.S. at 626–27 & n.26, the district court read into the textual meaning of the word "infringed" an implicit sanction for restrictions that are suitably tailored to achieving a legitimate government aim and allegedly not intended to hamper exercise of the right.

11

That was an improper application of *Heller*. Properly understood, neither *Heller* nor *Bruen* suggest that there is some separate class of "presumptively lawful" regulations that are subject to a different standard than other laws affecting arms-bearing conduct. Applying the *Bruen* text-and-history standard is *the only way* to determine whether a modern law "infringes" the right to keep and bear arms, and *Bruen*'s rejection of means-end scrutiny squarely forecloses the gloss that the district court gave to the word "infringed" in an attempt to resolve what it saw as tension between those two opinions. Applying this Court's decision in *Reese v. BATFE*, as the district court should have done, yields the correct result: "a purchase ban unknown at the time of the founding can[not] evade *Bruen* analysis." 127 F.4th 583, 590 n.2 (5th Cir. 2025).

The question then becomes, is the Ban historically justified? The answer to that question is a resounding no. Analyzing the historical support that the Government compiled below demonstrates that even restrictions on trade between competing colonies, long predating their unification into a single nation or the ratification of the Second Amendment, seldom if ever restricted firearm sales as significantly as the Ban does. And nothing from the Founding era comes close to

12

demonstrating a well-established and representative historical practice of similar regulations. The Ban therefore violates the Second Amendment.

## ARGUMENT

### I. Legal Standard.

Under the Supreme Court's decision in *Bruen*, the following standard governs cases challenging the constitutionality of laws under the Second Amendment:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, …. the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only [then] … may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

597 U.S. at 17 (quotation marks and citation omitted).

The district court granted the Government's motion to dismiss and denied Plaintiffs' motion for summary judgment because it concluded that the Ban does not implicate the Second Amendment's plain text. ROA.268. As the district court correctly noted, there are no disputed factual issues here, the determinative question is a legal one: Is the Ban constitutional under the Second Amendment? *See* ROA.260. This Court

reviews the application of the *Bruen* standard to such questions *de novo*.

*See Reese*, 127 F.4th at 589.

## II.    The District Court Erred In Holding the Ban Does Not Implicate the Second Amendment's Plain Text.

The Second Amendment's plain text reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court has explained that to "keep" in this context means that Americans have a right "to retain in one's power or possession," *i.e.*, to "have weapons." *Heller*, 554 U.S. at 582 (citation omitted) (analyzing Founding-era dictionaries). As this Court recognized in *Reese*, although "the words 'purchase,' 'sale,' or similar terms describing a transaction do not appear in the Second Amendment …. the right to 'keep and bear arms' surely implies the right to purchase them." 127 F.4th at 590–91.

This Court's conclusion in *Reese* was correct. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). As the Government recently acknowledged in another Second Amendment case, "the argument that a so-called ancillary right to

14

acquire a firearm is not included in the text of the Second Amendment is not supported by existing caselaw." Br. of United States as *Amicus Curiae* at 13, *Granata v. Campbell*, No. 25-1918 (1st Cir. Jan. 28, 2026) ("U.S. *Amicus* Br."). Rather, many courts (including this one) have recognized that the right to "have weapons," *Heller*, 554 U.S. at 582, " 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Reese*, 127 F.4th at 590 ("[T]he right to 'keep and bear arms' surely implies the right to purchase them."); *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) ("[O]ur court has consistently held that the Second Amendment also 'protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense' …. [and] we acknowledged that unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless." (quoting *Teixeira*, 873 F.3d at 677)); *see also Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. at 19 (" '[T]he right to possess firearms for protection implies a corresponding right' to obtain

15

the bullets necessary to use them." (quoting *Ezell*, 651 F.3d at 704));

*United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010),

*abrogated on other grounds by Bruen*, 597 U.S. at 19 (The conclusion that

"there would be no constitutional defect in prohibiting the commercial

sale of firearms …. would be untenable under *Heller*."); *Ill. Ass'n of

Firearm Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill.

2014) ("This right must also include the right to *acquire* a firearm."

(emphasis in original)); *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178

(1871) ("The right to keep arms, necessarily involves the right to

purchase them.").

The district court's conclusion that the plain text is not implicated

in this case ran afoul of these interpretive principles and was directly

contrary to *Reese*. It based its contrary reading on a fundamental

misunderstanding of this Court's precedents, the Supreme Court's

statement in *Heller* that certain "conditions and qualifications on the

commercial sale of arms" are "presumptively lawful," 554 U.S. at 626–27

& n.26, and out of circuit precedent. The upshot was that, although this

Court in *Reese* stated that "a purchase ban unknown at the time of the

founding can[not] evade *Bruen* analysis," 127 F.4th at 590 n.2, the

16

Nonresident Handgun Purchase Ban was given just such a pass by the district court.

Untangling the district court's error requires starting with its misreading of *Heller*. In *Heller*, en route to its conclusion that the District of Columbia's ban on possessing common handguns was unconstitutional in light of the Second Amendment's text and history, the Supreme Court cautioned that its recognition of an individual right to keep and bear arms did not entail the unconstitutionality of all the firearm laws that had been enacted in the years when courts were less than solicitous of Second Amendment claims. It said:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27. The Court referred to these as "presumptively lawful regulatory measures." *Id.* at 627 n.26.

In seeking to understand this "now-famous caveat," *United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023), *cert. granted, judgment vacated, and remanded in light of United States v. Rahimi*, 144 S. Ct.

17

2707 (2024) (mem.), the district court looked to the Ninth Circuit's opinion in *B&L*, which it flagged for a "helpful exposition of the logical relationship between *Heller*'s approval of conditions on firearms sales and *Bruen*'s 'plain text' threshold question." ROA.264. *B&L*, for its part, held that "[f]or any law to be 'presumptively lawful,' it necessarily must not implicate the plain text of the Second Amendment. Otherwise, *Bruen* makes clear that the Constitution would 'presumptively *protect*[] that conduct.' " ROA.264 (quoting *B&L Prods.*, 104 F.4th at 118–19). Adopting *B&L*'s view led the district court to a syllogism which resolved this case: "[L]aws that implicate the Second Amendment's plain text are presumptively unconstitutional. Conditions and qualifications on the commercial sale of firearms are not presumptively unconstitutional. Therefore, conditions and qualifications on the commercial sale of firearms do not implicate the Second Amendment's plain text." ROA.265.

This logic is flawed for at least four reasons.

1. As discussed above, the ordinary mode of constitutional interpretation requires reading the Second Amendment not just to protect "keeping" and "bearing" arms, but also those activities so closely connected to keeping and bearing that they are necessary to exercise that

18

right. Indeed, going back to *McCulloch v. Maryland*, the Supreme Court has consistently instructed that courts "must never forget that it is a *constitution* we are expounding" because a constitution, in order to be comprehended by the people, must not "partake of the prolixity of a legal code" but rather it should be assumed that "only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves." 17 U.S. 316, 407 (1819) (emphasis in original). That the Framers, in stating that the Second Amendment protects "keeping" arms did not separately mention "acquiring" them is, therefore, unsurprising, and the district court erred in drawing a distinction between the two that accorded a lesser degree of protection for such a "closely related right[]." *Luis*, 578 U.S. at 27 (Thomas, J., concurring).

2.    The district court's textual analysis is also inconsistent with *Bruen*. *Bruen*'s central doctrinal holding was that the Second Amendment right is not subject to "interest balancing," and regulations touching on the right to keep and bear arms cannot be justified merely because they satisfy some degree of means-ends scrutiny. *See* 597 U.S. at 17–24, 26, 29 n.7. Despite *Bruen*'s repeated warning against such

19

reasoning, the district court's putatively "textual" holding here hinged on its conclusion that the Ban does not "infringe" the right, by which it meant the Ban does not "serve an illegitimate purpose aimed at repressing the right, regulate the right more broadly than needed for a legitimate purpose, or effectively destroy the right." ROA.265 (citing Daniel D. Slate, *Infringed*, J. AM. CONST. HIST. 381, 386, 391, 441 (2025)). But that reasoning mirrored almost exactly the scrutiny analysis this Court conducted in *Mance* upholding the ban, pre-*Bruen*, under an analytical framework that was repudiated by the Supreme Court in *Bruen*. Compare, for example, the district court's reasoning that the Ban is "meant to protect the integrity of state laws, impose[s] a modest delay in time and cost, and use[s] non-discretionary rules" in holding it did not amount to an "infringement" of the right, ROA.266, with *Mance*'s conclusion that the Ban satisfied strict scrutiny because it furthered a "compelling government interest in preventing circumvention of the handgun laws of various states" and was "narrowly tailored" in part because it occasioned only a "de minimis" delay in acquiring a handgun from an out of state FFL. 896 F.3d at 707, 709. It would be odd, to say the least, for *Bruen* to have overruled *Mance*'s mode of analysis, and to

20

have specifically cautioned courts against using the historical framework it prescribes as a backdoor method for conducting an interest-balancing analysis, *see* 597 U.S. at 29 n.7, if the plain text's use of the word "infringe" effectively *incorporated* an interest balancing analysis. But that is precisely what the court below held.

It was wrong to do so. Nothing in the Supreme Court's caselaw discussing the scope of the Second Amendment authorizes such a reading of the word "infringe." In *Heller*'s lengthy textual analysis, where it otherwise exhaustively analyzed the language of the Second Amendment phrase by phrase and word by word (its analysis of the phrase "keep and bear arms" alone covers more than ten pages of the U.S. Reports), it did not analyze "infringe" at all. 554 U.S. at 579–92. That is not surprising, because the ultimate question the *Heller* Court was answering was whether the District of Columbia's handgun ban "infringed" the right and violated the Second Amendment. In other words, whether a law constitutes an "infringement" is not a predicate "textual" question but the ultimate legal conclusion, which can only be answered after appropriately analyzing it according to the standards prescribed by the Supreme Court. *See* U.S. *Amicus* Br. at 16 ("*Bruen* makes clear that

21

whether a law 'infringes' the right to bear arms is a legal conclusion, based on text and history."); *see also Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring) ("The Court employs and elaborates on the text, history, and tradition test that *Heller* and *McDonald* require for evaluating whether a government regulation infringes on the Second Amendment."). That a sales restriction "does not apply to all 'arms' or all methods of acquiring them is simply irrelevant to the threshold textual question *Bruen* requires this Court to answer." U.S. *Amicus* Br. at 13.

There is nothing unusual about this. Whether a law "prohibit[s]" the free exercise of religion or "abridg[es]" the freedom of speech is not a predicate textual question in First Amendment cases, but the result reached after the proper First Amendment analysis is done. *See, e.g.*, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."); *see also Bruen*, 597 U.S. at 24 (citing *Playboy* for the proposition that the *Bruen* standard "accords with how we protect other constitutional rights"). So too here— whether the Ban "infringes" the Second Amendment protected right to

keep and bear arms is something that can only be known after conducting a textual and historical analysis adhering to *Bruen* and *Rahimi*'s examples. To supplant that analysis with a free-ranging conception of "infringement" that turns on both the degree of "burden" imposed by a regulation and the government's reasons for imposing that burden reinvents the standard that *Bruen* rejected and that this Court is bound to reject as well.

3.    The district court's analysis also conflicts with this Court's precedent, which correctly adheres to these principles. In holding a ban on 18-to-20-year-olds acquiring handguns from licensed firearms dealers was unconstitutional, this Court held that "the right to 'keep and bear arms' surely implies the right to purchase them." *Reese*, 127 F.4th at 590. As a result, *Reese* explained, "a purchase ban unknown at the time of the founding can[not] evade *Bruen* analysis." *Id.* at 590 n.2. Furthermore, like the Ban at issue here, the law challenged in *Reese* did not totally ban the sale of handguns. While it barred sales from licensed dealers, it left 18-to-20-year-olds free to acquire handguns in the secondary market. In holding that the law nevertheless implicated (and ultimately violated) the Second Amendment, this Court specifically rejected the argument

23

that the degree of burden might be relevant at the "textual" stage of the analysis as "fundamentally inconsistent with the *Bruen/Rahimi* framework. The threshold textual question is not whether the laws and regulations impose reasonable or historically grounded limitations, but whether the Second Amendment 'covers' the conduct (commercial purchases) to begin with." *Id.* at 590; *see also* U.S. *Amicus* Br. at 16 ("Inquiring whether the litigants in a case had other means to acquire similar firearms, or other firearms at all, is simply not part of the Second Amendment equation.").

That should have at least resolved the textual question in Plaintiffs' favor as a matter of circuit precedent. But the district court distinguished *Reese* on the very grounds that *Reese* said should be inapplicable—the degree of burden imposed by the regulation—and held that the Ban is more akin to the enhanced background check requirements imposed on firearm sales to 18-to-20-year-olds which this Court upheld in *McRorey*.[1] ROA.266. *McRorey*, the district court explained, concluded that because

---

[1] Plaintiffs do not believe *McRorey* runs contrary to their claims and recognize that the panel is bound to follow that case. However, Plaintiffs reserve the right to argue that *McRorey* was wrongly decided to a court competent to overturn it.

the background check requirement was "a lawful regulatory measure" that did " 'not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right[s]' " it "did not implicate the plain text of the Second Amendment." ROA.263 (quoting *Bruen*, 597 U.S. at 38 n.9) (brackets in district court opinion).

But *McRorey* did not hold that sales restrictions evade Second Amendment scrutiny. Although it acknowledged that "on its face 'keep and bear' does not include purchase," *McRorey* stopped short of holding that all laws regulating sales necessarily fall outside the Second Amendment's textual sweep. 99 F.4th at 838. To the contrary, *McRorey* made clear that "[t]he right to 'keep and bear' *can* implicate the right to purchase." *Id.* (emphasis added). Otherwise, it cautioned, the Government could "shoehorn[] restrictions on purchase into functional prohibitions on keeping." *Id. McRorey* held that the law before it was not such a restriction because it read *Bruen* as denying any right to come into possession of a firearm without submitting to a background check. *Id.* at 837 ("*Bruen*'s footnote 9 [addressing shall-issue permitting regimes and background checks] plainly forecloses plaintiffs' contention" that the background check regime is unconstitutional). But here, unlike in

25

*McRorey*, the Ban is not a restriction which *Bruen* specifically addressed. Furthermore, the law at issue in *McRorey* did not actually prevent *any* sales to an individual who could legally acquire a firearm, but the Ban, like the law at issue in *Reese*, does prevent certain categories of sales. That means that determining whether it runs afoul of the Second Amendment requires doing the "*Bruen* analysis." *Reese*, 127 F.4th at 590 n.2.

That would still be the case even if this Court were to conclude that determining whether the Ban falls within the plain text of the Second Amendment under *McRorey* and *Reese* requires determining whether the Ban is a severe enough restriction on the sales that it implicates the right to "keep and bear" arms. Despite the district court's repeated assurances that the ban "impose[s] a modest delay in time and cost" to those acquiring handguns, that dramatically understates what the Ban does. It bars any citizen anywhere from acquiring a handgun directly from a licensed dealer in another state. The district court's analysis placed a lot of weight on a workaround that allows interstate transfers if the buyer can arrange for the transaction to be routed through an in-state dealer from whom he can ultimately acquire the handgun. *See* 18 U.S.C.

26

§ 922(a)(3), (b). But that exception's only real effect is to give in-state dealers an absolute veto on competition from out of state and effectively to require an individual seeking to buy a firearm from an out-of-state dealer to pay a premium to do so. What is more, it does not address at all the plight of a person who desires to acquire a firearm outside of his home state for immediate use in that state.

Furthermore, although the district court suggested the costs associated with these arrangements are "modest," as the Supreme Court has made clear, the Second Amendment does not protect "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality op.)). And in the context of any other constitutional right, even a small cost would undoubtedly be treated as triggering constitutional scrutiny, given the obvious fact that the imposition of a cost has a "direct tendency" to restrict the exercise of the right. *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244–45 (1936); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966) (striking down poll tax of $1.50); *Boynton v. Kusper*, 494 N.E.2d 135, 141 (Ill. 1986) (striking down $10 tax on marriage licenses); *cf. Carey v. Population*

27

*Servs., Int'l*, 431 U.S. 678, 687, 689 (1977) (striking down a state law limiting sale of contraceptives to licensed pharmacists because "[r]estrictions on the distribution of contraceptives" both lessened consumer choice in where to purchase and "lessens the possibility of price competition"). That the Ban specifically singles out handguns, "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629, for this unusual restriction makes the claim that the Ban is so modest as to escape all constitutional scrutiny particularly untenable.

Tellingly, the Government itself has since concluded that a similar provision of federal law, 18 U.S.C. § 1715, which prohibits the transportation by mail of handguns, constitutes an "infringement" of the right. *See* Constitutionality of 18 U.S.C. § 1715, 49 Op. O.L.C. (Jan. 15, 2026) (slip op. at 8). In so concluding, the Government explained that the restriction (which can also be avoided by sending the firearm from one licensed dealer to another, just as in this case) "imposes gratuitous burdens on the right to acquire and maintain firearms" and implicates the Second Amendment because the right to keep and bear arms "would be meaningless if the government could prevent citizens from ever receiving [protected] arms." *Id.* at 6. That same reasoning demonstrates

28

that, under any standard, the Ban is an "infringement" of the right that should have passed the threshold textual hurdle under *Bruen*.

4.    Ultimately the district court's confusion stemmed from its attempt to reconcile "the logical relationship between *Heller*'s approval of conditions on firearms sales and *Bruen*'s 'plain text' threshold question." ROA.264. But there is no warrant in *Heller* for reading the Ban out of the Second Amendment's plain text merely because it regulates the sale—and thus acquisition—of firearms. It is true that *Heller* referred to laws placing "conditions and qualifications on the commercial sale of arms" as "presumptively lawful." 554 U.S. at 626 & n.26. But in suggesting that this permits such regulations to avoid Second Amendment scrutiny altogether by placing them outside of its plain text, the district court (and the Ninth Circuit cases on which it relied) overread this language. Nothing in this language suggests that the Court created an "exception" to the text-and-history analytical method it applied to D.C.'s handgun ban for the enumerated "presumptively lawful" regulations. To the contrary, it signaled that *Heller* was not deciding those issues and was cautioning lower courts against treating them as necessarily unconstitutional under the interpretation of the Second

29

Amendment the Supreme Court announced for the first time in *Heller*. In other words, the point of the "presumptively lawful" language was that, like all statutes that have not yet been challenged, those laws that were not passed upon in *Heller* could be treated as good law unless and until they were challenged. *Heller* was leaving the application of its framework (later reiterated in *Bruen*) to those questions for other courts to work out in the first instance; it was not precluding those courts from conducting a fulsome review. As the Sixth Circuit has explained, the enumerated "presumptively lawful regulations" "weren't before the Court in *Heller* or *McDonald*. And while *Bruen* didn't overrule any aspect of *Heller*, it set forth a new analytical framework for courts to address Second Amendment challenges," such that even the "longstanding" prohibitions mentioned in *Heller* have to be analyzed under the *Bruen* framework. *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024).

That reading gains force when the rest of *Heller*'s "presumptively lawful" regulations are considered. In addition to "conditions and qualifications on the commercial sale of arms," *Heller* listed "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive

30

places such as schools and government buildings" in its catalogue of "presumptively lawful" restrictions. 554 U.S. at 626–27 & n.26. Under the district court's reading, no such laws presumptively implicate the text of the Second Amendment (unless they can be shown to meet its convoluted test for an "infringement"). But that cannot be right, as this Court has repeatedly held that "[t]he plain text of the Second Amendment covers the conduct prohibited by [the federal ban on felon firearm possession] § 922(g)(1)." *United States v. Hembree*, No. 24-60436, 2026 WL 217125, at *2 (5th Cir. Jan. 27, 2026) (quoting *United States v. Diaz*, 116 F.4th 458, 467 (5th Cir. 2024), *cert denied*, 145 S. Ct. 2822 (2025) (mem.)); *see also Reese*, 127 F.4th at 590 n.2. And *Bruen* itself referenced *Heller*'s dicta regarding restrictions in "schools and government buildings," but rather than suggesting that they were subject to a different form of analysis (or outside the Second Amendment's text entirely), it used them as an *example* of the framework it was prescribing; *Bruen* instructed that in reviewing modern locational restrictions, courts should use as a starting point in their historical analysis the "longstanding" laws in the historical record (citing historical regulations at "legislative assemblies, polling places, and courthouses")

31

and "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 597 U.S. at 30 (emphasis in original). The Court never once suggested that such restrictions evade scrutiny altogether.

### III.    The Ban Is a Historical Aberration Inconsistent with the Right to Keep and Bear Arms.

Because the Ban implicates the plain text of the Second Amendment, the question is whether the Government has carried its burden by showing that the Ban is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Although the district court never reached this issue, this Court should. This case is different from one in which the district court resolved its analysis on some separate threshold ground like standing or ripeness. The *Bruen* analysis, which this Court reviews *de novo*, is a unitary merits analysis which, although the district court did not *complete* below, was fully briefed to the district court by the parties. Given that the Government provided a full historical defense of the law below and will have the opportunity to renew that defense here, a remand is unnecessary and would merely expend judicial resources and delay

32

resolution of this case. *See Hembree*, 2026 WL 217125, at *4 n.3 (recognizing that in some instances this Court has "declined to remand when parties proffered sufficient records" to conduct the *Bruen* analysis).

In conducting the historical analysis prescribed by *Bruen*, " '[w]hy and how the regulation burdens the right are central to this inquiry' in 'considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.' " *Reese*, 127 F.4th at 588 (quoting *Rahimi*, 602 U.S. at 692). In conducting this analysis, the focus must be on Founding-era limitations on the right. Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J.L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://perma.cc/F98Y-3D32. While later laws may confirm or clarify the scope of a Founding-era tradition, "[p]roceeding past the bounds of founding-era analogues … is risky under *Bruen*." *Reese*, 127 F.4th at 599; *see also id.* at 588 ("[A] law may unconstitutionally infringe on the right when it goes 'beyond what was done at the founding,' 'even when it regulates arms-bearing for a permissible reason.' ") (quoting *Rahimi*, 602 U.S. at 692) (cleaned up). In this case, the issue of the value of *later* laws is largely academic, since the laws the Government collected below

33

extend, at the latest, to 1820. But it did cite several early colonial laws from the 17th century, some of which predate the ratification of the Second Amendment by 150 years. *See, e.g.*, Act of Feb. 21, 1631, *in* 1 WILLIAM WALLER HENING, STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 174–75 (New York, R. & W. & G. Bartow 1823), https://perma.cc/M4YT-BXQA (1631 law); J. HAMMOND TRUMBULL, PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 138–39 (Hartford, Brown & Parsons 1850), https://perma.cc/XQ6Y-FMU7 (1642 law). And these laws are at least as shaky a basis to rest *Bruen*'s historical analysis on as are laws that come too late. *See* 597 U.S. at 34 ("Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.").

Keeping those principles in mind, the Government has failed to offer an adequate historical justification for the Ban. The Government's historical pitch is that at some points prior to the Founding, laws "entirely foreclosed commercial transactions with out-of-state individuals and others," and that "[s]ince the time of the Founding, states have regulated how firearms and gunpowder can be traded and transported, particularly across state lines." ROA.174–75. These

34

historical principles, the Government claims, are the same that undergird the Ban because both the historical laws and the modern Ban sought "to ensure only law-abiding citizens acquire firearms," including by "foreclos[ing] commercial transactions with out-of-state individuals and others." ROA.174. Indeed, the Government claimed that the Ban exacts a lighter burden on the right than several of its historical analogues, because it only "modestly delay[s] the time an individual who purchases a handgun while out-of-state may take delivery of a handgun." ROA.174. Plaintiffs do not here take issue with the Government's claim that it can keep certain categories of prohibited persons from acquiring firearms, but they disagree that the Ban is an acceptable way of promoting that goal. As noted above, the Government's justification for the Ban requires misunderstanding the nature of the Ban as a flat prohibition acquiring handguns from out-of-state dealers, and it involves precisely the sort of interest-balancing reasoning that the Supreme Court has forbidden. The question, for this Court, is whether these historical laws evidence a principle that residents of one state can be barred from purchasing a firearm in another state. They do not.

35

*Bruen* instructs that analyzing "how" and "why" historical regulations limited the exercise of the right are both "central considerations" when analogizing to a modern law. 597 U.S. at 29 (citation and quotation marks omitted). Several of the Government's laws can be rejected out of hand as having nothing to do with restricting the transfer of firearms across state boundaries at all (the "how") and having been motivated by concerns entirely distinct from the Government's purported goal of ensuring that prohibited persons not acquire arms (the "why").

***Proving laws and manufacturing restrictions.*** Take, for instance, the several gunpowder or firearm proving laws the Government cited below. None of these laws are at all relevant to the present dispute, as not one stopped citizens of one state from acquiring firearms or gunpowder in another, or even restricted interstate commerce at all. Start with the 1795 Pennsylvania law that prohibited anyone from importing gunpowder for sale into Pennsylvania without subjecting it first to inspection and marking. *See* Act of Apr. 18, 1795, ch. 1846, *in* 3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA 240–44 (Phila., John Bioren 1810), https://perma.cc/SD65-EBN6. The law, which was aimed at

preventing the importation of gunpowder "of inferior qualities" with "defects [that are] not discovered until brought into actual use[,]" did not prevent *anyone* from bringing gunpowder in from another state, even for sale, and it only applied its proving requirement to large quantities. *Id.* at 240. It therefore exacted an entirely different *type* of burden on the right to keep and bear arms (if indeed requiring that gunpowder be functional can be called a burden at all). And it did so for obviously different reasons. It was concerned not with keeping individuals who should not possess firearms or gunpowder from acquiring it, but with ensuring that gunpowder that was offered for sale within Pennsylvania was of adequate quality.

The government cited two other gunpowder laws below that are similarly irrelevant. An 1820 New Hampshire law, it claims, "created a state gunpowder inspection regime to examine manufacturing and storage sites," and an 1811 New Jersey law "required all gun powder manufacturers to obtain a license." ROA.177. It is apparent even from these descriptions that the laws are unrelated to the Ban—neither restricted interstate commerce in the slightest. As with the Pennsylvania law, the New Hampshire law was merely a quality control statute

designed to prevent the sale or use of defective powder. *See, e.g.*, Act of June 21, 1820, ch. 24, § 2, *in* 8 LAWS OF NEW HAMPSHIRE 908 (Concord, Evans Printing Co. 1920), https://perma.cc/LHC5-AATL (prescribing proportions of ingredients for production of acceptable gunpowder). As long as the proving and manufacturing restrictions were met, it imposed no jurisdictional restrictions on the sale or export of powder. And the Government misstates the New Jersey law, which did not require anyone to obtain a license to manufacture gunpower; it merely restricted, as a fire-prevention measure, the places where new gunpowder factories could be built. *See* Act of Feb. 7, 1811, 1811 N.J. Laws 300, § 1, *in* LAWS OF THE STATE OF NEW-JERSEY 549 (Trenton, Joseph Justice 1821), https://perma.cc/3N3H-U38U.

Finally, the Government cited an 1814 Massachusetts law that "prohibited the sale of any musket or pistol unless it was approved, marked, and stamped by a government official" and an 1821 Maine law that did the same. ROA.176–77. But again, neither law restricted sales to nonresidents or purchases by their residents of firearms that were made out of state. Both were focused on regulating anyone selling new firearms "within this State," Act of Mar. 10, 1821, ch. 162, § 3, *in* 2 LAWS

38

OF THE STATE OF MAINE 802 (Francis O. J. Smith ed., Portland, Thomas Todd & Colman, Holden & Co. 1834), https://perma.cc/T9BN-XRXE; *see also* Act of Feb. 28, 1814, ch. 192, § 2, *in* 6 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 464–65 (Bos., Russell, Cutler & Co. 1812–15), https://perma.cc/6V4Q-YN2S (prohibiting manufacturing "within this Commonwealth" or selling or purchasing an unproven musket or pistol), and then only prohibited the sale if the firearms were not first "proved" to make sure they did not have latent defects in their barrels. Again, these laws were effectively precursors to consumer protection statutes and are nothing like the Ban.

*Public defense restrictions.* The rest of the government's historical support below constitutes historical limitations placed on the sale of certain firearms or gunpowder to individuals located in other jurisdictions. But although that broad description might seem to suggest a degree of similarity between those laws and the Ban, on closer examination they do not support the Ban. Take first two early laws prohibiting export of gunpowder without a license. One, from Massachusetts in 1651, did not operate at all like the Ban. Rather, it was essentially aimed at preventing embezzlement of *public* stores of

39

gunpowder. As the statute itself explains, it was concerned with preserving the powder and ammunition "[i]mported into this jurisdiction for our necessary use and defence" every year "by favour of the Government in England." COLONIAL LAWS OF MASSACHUSETTS 125–26 (Bos., 1887), https://perma.cc/8JYU-46MH. It therefore required individuals who were bringing powder or ammunition into the colony to give notice of the quantity imported to the public notary, who could permit the individual to export only the same quantity of powder he had brought into the colony, ensuring that the public stores would not be depleted.

The other, a 1775 Connecticut statute, is similarly inapposite. Passed early in the American Revolution, the statute evidences an overwhelming concern with ensuring that Connecticut and her citizens would have enough powder to carry out the war. In addition to forbidding anyone from exporting powder without a license from the General Assembly, the statute subsidized the manufacture of powder within the colony and further required any town where powder was not manufactured to create a powder factory "at the expence and for the benefit of said town." Act of Dec. 1775, *in* 11 THE PUBLIC RECORDS OF THE

40

COLONY OF CONNECTICUT 190–91 (Charles J. Hoadly ed., Hartford, Case, Lockwood & Brainard Co. 1890), https://perma.cc/3QWS-ZPJA (entitled "An Act for encouraging the Manufactures of Salt Petre and Gun Powder"). As a wartime measure, this law has little weight in determining the scope of the Second Amendment right. *See Bruen*, 597 U.S. at 63 n.26.

Several firearm laws from the period were similarly focused on preserving (often public) arms for use in wartime. For instance, the Government below pointed to a 1720 Virginia statute it said "restricted residents of the counties of Spotsylvania and Brunswick from transporting firearms outside the county" and a 1719 South Carolina law that "completely banned the export of all firearms, including through sale." ROA.175–76. But in both cases, the laws only restricted the sale or export of arms *owned* by the county or by the state and did not in any way restrict the *private* import or export of firearms. The 1720 Virginia law allocated £1,000 for the purchase of firearms for the defense of the newly established counties and permitted any person in the county who needed one for defense to use a county-owned firearm for that purpose, but it restricted those persons from removing them outside of the county.

41

WAVERLY K. WINFREE, BEING A SUPPLEMENT TO HENING'S THE STATUTE'S AT LARGE 181–82 (1971). The 1719 South Carolina law likewise began by noting that the English government had sent it "a good quantity of arms" and that the colony had itself "been at great expences to buy and procure great quantities of arms" for its defense. Act of Feb. 12, 1719, *in* 3 THOMAS COOPER, THE STATUTES AT LARGE OF SOUTH CAROLINA 100–01 (Columbia, A.S. Johnston 1838), https://perma.cc/83KF-YNBZ. It was these publicly owned arms, specifically, that citizens were barred from selling or loaning outside of the colony. *Id.* at 101. Just as with the 1651 Massachusetts gunpowder law, these laws are unlike the Ban because they did not apply to ordinary selling or buying of privately owned firearms but were, effectively, laws aimed at securing *public* defense equipment.

A 1776 Maryland statute that the Government cited as "banning the export of all firearms unless the owner was permanently relocating outside the jurisdiction," ROA.176, does appear to have gone further and to have covered even privately owned firearms, but as with the 1775 Connecticut gunpowder statute, it was a wartime measure that on its face evinces its concern with ensuring that there were enough firearms

42

in Maryland to carry out the Revolutionary War. (For instance, other provisions of the same act appropriated public funds to purchase 600 muskets and exempted anyone working on manufacturing or repairing firearms for militia use from serving in the militia themselves.) PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND 146–47 (Balt., James Lucas & E.K. Deaver 1836), https://perma.cc/4AEL-NB5A. Indeed, the restrictions were explicitly temporary, *see id.* at 147 (forbidding export "without the leave of the council of safety for the time being"), further demonstrating that they were exceptional wartime measures that were both unlike the Ban and motivated by different concerns.

***Registration laws.*** The Government also pointed below to an inapposite pair of Virginia laws from 1631 and 1651 that, it claimed, "created a registration regime that required the recording of all new arrivals to the colony, including their arms and munitions." ROA.175. Even as described by the Government, it is not clear how such laws could have any relevance to the constitutionality of the Ban, and the Government offers no further explanation. But an examination of the laws proves they are inapposite. The 1631 law was a census law which

43

required a periodic accounting not just of persons and firearms, but also "corne, cattle, hoggs, goates, barques, boates, gardens, and orchards." 1 HENING, *supra*, at 174–75. The 1651 "law" was actually a treaty between Virginia and England and required, in its thirteenth provision, that the colonists should be required to surrender all "powder and arms, other than for private use" to the King. *Id.* at 365. The treaty did not forbid the sale, import, or export of any arms and it explicitly exempted even from surrender arms "for private use." It has no relevance to the Ban.

Furthermore, it is doubtful that any law or treaty ordering the surrender of colonial arms to the English government could possibly be a useful guide to understanding the Second Amendment. It rather seems like precisely the sort of intrusion into American rights that the Second Amendment was designed to prevent—not a terribly surprising fact given that it was enacted nearly forty years before even the 1689 English Bill of Rights, the "predecessor to our Second Amendment," was adopted (in large part due to similar laws that disarmed those of whom the Crown was suspicious or jealous). *Heller*, 554 U.S. at 593 (discussing a 1671 law under which "the Catholic Charles II had ordered general disarmaments of regions home to his Protestant enemies"). Even in a more related case,

44

such a law should almost certainly be totally disregarded as evidence of the scope of the Second Amendment.

***Import and Export Restrictions***. That leaves four laws cited by the Government that appear, in some sense, to have restricted inter-colonial commerce in firearms. *See* ROA.175–76 (citing laws from Connecticut (1642 and 1650), New York (1652) and Virginia (1677)). But in addition to being individually distinguishable, these laws suffer from some overarching problems that make them poor historical predecessors for the Ban. The first is the same timing problem that makes the 1651 Virginia treaty just discussed such an unlikely guide to the scope of the Second Amendment: the earliest of these laws dates to 1642 and the latest to 1677. None were enacted within 100 years of the Second Amendment's ratification, and every one of them predates even the English Bill of Rights' more limited guarantee of the right to keep and bear arms. *See Bruen*, 597 U.S. at 34 ("Historical evidence that long predates either [the ratification of the Second or Fourteenth Amendments] may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years."). As such, without evidence of similar restrictions that survived to and existed at the

45

Founding, they provide little insight as to "the scope [the Second Amendment] w[as] understood to have when the people adopted [it]." *Heller*, 554 U.S. at 634–35; *see also Bruen*, 597 U.S. at 41 (discounting the value of the Statute of Northampton). Indeed, while here the government has four putative analogues from this period, in *Bruen* the Supreme Court found three and entirely rejected reliance on them, suggesting that their remoteness from the Founding *alone* would be an adequate reason to disregard them. 597 U.S. at 46 ("For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.").

This remoteness in time is particularly salient here because one relevant "legal convention" underwent a major change between the mid-1600s and the ratification of the Second Amendment: the transformation of the formerly independent Colonies into members of a single sovereign nation, through the Revolution, adoption of the Articles of Confederation, and ultimately the Constitution. What is more, a "central concern" of the Framers, and "an immediate reason for calling the Constitutional Convention[,]" was "the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic

46

Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979). Laws that contributed to that "economic Balkanization" are a suspect lens, to say the least, through which to analyze the scope of the Constitution. In arguing for the Constitution's ratification, Alexander Hamilton stressed the value of "unrestrained intercourse between the States themselves," THE FEDERALIST NO. 11, at 71 (Alexander Hamilton) (Jacob E. Cooke ed., 1961), while Madison bemoaned "[t]he defect of power in the existing Confederacy to regulate the commerce between its several members," THE FEDERALIST NO. 42, at 283 (James Madison) (Jacob E. Cooke ed., 1961). And in the end, "[t]he power over commerce … was one of the primary objects for which the people of America adopted their government." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 190 (1824). The remaining laws on which the Government relies must be read in light of the fact that the Colonies in 1642 stood in a fundamentally different relationship to one another (allies and competitors) than the States did in 1792 or do today (members of a single economic and national union).

47

Even aside from those shortcomings, these laws are inadequate to support the Ban. Begin with the 1642 Connecticut law that the Government argued "banned the sale of firearms by its residents outside the colony." ROA.175. The Government's reading of the statute is not correct. The law appears not to have been a restriction on trading arms outside of Connecticut, but outside of the English colonies more generally, as part of a concerted effort to keep arms *within* "the Jurisdictions in combinatio[n]" or "the confederate jurisdictions" and out of the hands of the Native American tribes, or the Dutch and French who more freely traded with them. TRUMBULL, PUBLIC RECORDS, *supra*, at 113–14, 138, 145–46; *see also id.* at 138 (suggesting that "some consideration be taken to restrayne Roade Iland fro[m] trading w[i]th the [Native Americans] in such kynd"). Because they were aimed at restricting trade essentially *outside* of the "country" and not within it, and in fact permitted trade with other colonies, the law would be more akin to a restriction on selling firearms outside the United States than a Ban on selling to citizens of another state.

The Government's 1650 Connecticut law appears to have gone further to ban the sale of firearms to "any person inhabiting out of *this*

48

*jurisdiction*, without license of this court or from some two magistrates." The First Code of Laws, May 1650, *in* TRUE-BLUE LAWS OF CONNECTICUT AND NEW HAVEN AND THE FALSE BLUE LAWS 92 (J. Hammond Trumbull ed., Hartford, 1876), https://perma.cc/H4QJ-BXY8 (emphasis added). This law itself demonstrates that the earlier Connecticut law should not be read to have gone as far, since it begins by noting that those previous enactments had been insufficient to prevent "Indians … [from being] supplied by indirect means" with firearms and gunpowder. *Id.* And it is notably disanalogous to the Ban in "how" it restricted commerce in firearms in that a licensed individual, under this scheme, still *could* make sales across colony lines. The Ban *bars* licensed firearm sellers from selling handguns to nonresidents. It also differs in "why" it restricted the transfer of firearms, both because it was aimed at preventing the flow of arms to a group of people who were not part of the national community but with whom the colonists were frequently at war (the very next provision of the government's cited source makes it illegal for any colonists to "depart from amongst us, and take up their abode with the Indians, in a profane course of life," *id.*), and because it placed restrictions on trade between what were, at the time, separate colonies with other

49

existing trade barriers between them, not states in an economic and national union.

The government also cited a 1677 Virginia law that "provid[ed] that all persons were at 'liberty to sell armes and ammunition to any of his majesties loyal subjects inhabiting *this colony.*' " ROA.175 (quoting 2 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 403 (New York, R. & W. & G. Bartow 1823), https://perma.cc/9QB8-QW4Y) (emphasis added by the Government). But a grant of authority to sell to "loyal subjects inhabiting this colony" is not a ban on selling *outside* of the colony. In fact, the far better reading is that the statute implies that it was not legal to sell to *disloyal* subjects within the colony. Again, the timing of this enactment is critical. The year before, in 1676, Bacon's Rebellion, "the first major uprising by American colonists against colonial leadership" had swept across Virginia and resulted in the burning of its capitol city, Jamestown, to the ground. Edward St. Germain, *Bacon's Rebellion of 1676*, AMERICANREVOLUTION.ORG, https://perma.cc/5NDF-DLWG. In 1677, Virginia was not worried about sales to loyal or allied people outside of its jurisdiction, but to rebels, within or without. Consistent with this

50

reading, the statute also permits the friendly "Indians of the Easterne shore … like and equal liberty of trade or otherwayes with any other our friends and neighbouring Indians." 2 HENING, *supra*, at 403.

Finally, the Government cited a 1652 New York law which would be a dubious basis on which to uphold the Ban. For one thing, the text of the law itself, which is entitled "Of the Director and Council of New Netherland against Illegal Trade in Powder, Lead, and Guns in New Netherland by Private persons. *Passed April*, 1652," has been lost. LAWS AND ORDINANCES OF NEW NETHERLAND 128 (E.B. O'Callaghan ed., Albany, Weed, Parsons & Co. 1868), https://perma.cc/9SYQ-QG8H. From its title, it appears to have been directed only at "illegal trade" in firearms and, as the title also suggests, it was enacted before New York even became an English colony with the rights that entailed. The compiler of the laws, in addition to noting it is missing from historical records, also states that it "seems, indeed, not to have been very strictly enforced," and that its true aim, as with so many of the above statutes, was in fact the prevention of trade of ammunition and arms to Native Americans. *Id.* There is, in short, no basis on which to find it is an analogue for the Ban. *See Nguyen v. Bonta*, 140 F.4th 1237, 1246 n.4 (9th Cir. 2025) ("Because

51

the exact text of this law is unavailable, we are unable to determine if this is a sufficient historical analogue.").

The result of this analysis must be to conclude that the Ban is unsupported by any historical regulations—the only meaningful metric under *Bruen*—and is therefore inconsistent with the Second Amendment.

## CONCLUSION

The judgment of the district court should be reversed and the case should be remanded with instruction to enter summary judgment in Plaintiffs' favor.

Dated: February 4, 2026                    Respectfully Submitted,

 

|  |  |
|---|---|
| | /s/ David H. Thompson |
| Cody J. Wisniewski | David H. Thompson |
| FPC ACTION FOUNDATION | Peter A. Patterson |
| 5550 Painted Mirage Road | William V. Bergstrom |
| Suite 320 | COOPER & KIRK, PLLC |
| Las Vegas, Nevada 89149 | 1523 New Hampshire Ave., N.W. |
| Telephone: (615) 955-4306 | Washington, D.C. 20036 |
| Facsimile: (615) 334-0463 | Telephone: (202) 220-9600 |
| cwi@fpcafhq.org | Facsimile: (202) 220-9601 |
| | dthompson@cooperkirk.com |
| | ppatterson@cooperkirk.com |
| | wbergstrom@cooperkirk.com |

*Counsel for Plaintiffs-Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit on February 4, 2026 by using the CM/ECF system and that service was accomplished on all counsel of record by the appellate CM/ECF system.

/s/ David H. Thompson

David H. Thompson

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 10,452 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Century Schoolbook, 14-point font.

Dated:  February 4, 2026

/s/ David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellants*