**No. 25-11206**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

ELITE PRECISION CUSTOMS L.L.C.; TIM HERRON; FREDDIE BLISH;
FIREARMS POLICY COALITION, INCORPORATED, a nonprofit
corporation,

                Plaintiffs-Appellants,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES;
TODD WALLACE BLANCHE, Acting U.S. Attorney General; DANIEL
DRISCOLL, Acting Director, U.S. Bureau of Alcohol, Tobacco, Firearms, and
Explosives,

                Defendants-Appellees.

---

On Appeal from the United States District Court
for the Northern District of Texas (No. 4:25-cv-00044)

---

**BRIEF FOR APPELLEES**

---

        BRETT A. SHUMATE
          *Assistant Attorney General*

        RYAN R. RAYBOULD
          *United States Attorney*

        BRAD HINSHELWOOD
        LAURA E. MYRON
          *Attorneys, Appellate Staff*
          *Civil Division, Room 7228*
          *U.S. Department of Justice*
          *950 Pennsylvania Avenue NW*
          *Washington, DC 20530*
          *(202) 514-4819*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties. 5th Cir. R. 28.2.1

*s/ Laura E. Myron*

LAURA E. MYRON

## STATEMENT REGARDING ORAL ARGUMENT

The district court correctly dismissed this case. The defendants-appellees stand ready to present oral argument if the Court believes it would help resolve the questions presented in this case.

# TABLE OF CONTENTS

Page

STATEMENT OF JURISDICTION ............................................................... 1

STATEMENT OF THE ISSUE ...................................................................... 1

STATEMENT OF THE CASE......................................................................... 1

    A.    Statutory Background........................................................................1

    B.    Factual Background .........................................................................5

    C.    Prior Proceedings ...........................................................................6

SUMMARY OF ARGUMENT...................................................................... 8

STANDARD OF REVIEW .......................................................................... 11

ARGUMENT................................................................................................ 11

    The Federal Interstate-Transfer Regulatory Framework Is Not
    Facially Unconstitutional Under the Second Amendment. ................. 11

CONCLUSION ........................................................................................... 33

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**

*B&L Prods., Inc. v. Newsom,*
  104 F.4th 108 (9th Cir. 2024) .......................................................... 20

*Bezet v. United States,*
  714 F. App'x 336 (5th Cir. 2017) ..................................................... 21

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................ 8, 12, 13

*Mance v. Sessions,*
  896 F.3d 699 (5th Cir. 2018) ....................................... 6, 19, 27, 28, 30

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) ......................................................... 26

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ......................................................................... 13

*McRorey v. Garland,*
  99 F.4th 831 (5th Cir. 2024) ................................. 8, 9, 13, 14, 18, 20, 21, 29

*New York State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022) .......................................... 6, 9, 12, 13, 14, 19, 21, 26, 29, 30

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co.,*
  9 F.4th 247 (5th Cir. 2021) .............................................................. 11

*Reese v. ATF,*
  127 F.4th 583 (5th Cir. 2025) ....................................... 8, 9, 12, 18, 19

*Teixeira v. County of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ....................................... 21, 22, 28, 30

*United States v. Holton,*
  639 F. Supp. 3d 704 (N.D. Tex. 2022) ........................................... 29

*United States v. Libertad,*
   681 F. Supp. 3d 102 (S.D.N.Y. 2023) ....................................... 7, 15

*United States v. Quiroz,*
   125 F.4th 713 (5th Cir. 2025) ................................................ 26, 27

*United States v. Rahimi,*
   602 U.S. 680 (2024) .................................... 6, 10, 11, 12, 13, 26, 30, 32

*United States v. Serrano,*
   651 F. Supp. 3d 1192 (S.D. Cal. 2023) ........................................ 29

*United States v. Vereen,*
   152 F.4th 89 (2d Cir. 2025) ................... 10, 11, 22, 25, 26, 28, 29-30, 30, 31, 32

**Statutes:**

Act of June 21, 1820, ch. XXV, 1820 N.H. Laws 274 ........................................25

An Act to Regulate Trade and Intercourse with the Indian Tribes and to
   Preserve Peace on the Frontiers, § 9, 1802 Miss. Laws 593 (Samuel Terrell
   1807) ........................................................................................31

Federal Firearms Act, Pub. L. No. 75-785, ch. 850, 52 Stat. 1250 (1938)
   (repealed 1968)..........................................................................16

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968) ............1, 16

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351,
   tit. IV, § 901(a)(1), 82 Stat. 197 (1968).....................................1, 15, 28

18 U.S.C. § 922(a)(3) ...................................................................... 2

18 U.S.C. § 922(a)(5) ....................................................................2, 3

18 U.S.C. § 922(b)(3) ..................................................................2, 3, 4

18 U.S.C. § 926(a) ......................................................................... 3

28 U.S.C. § 1291 ........................................................................... 1

28 U.S.C. § 1331 ........................................................................... 1

1652 N.Y. Laws 128 ............................................................................. 24

1814 Mass. Acts 464, ch. 192, §2 ........................................................25

1811 N.J. Laws 300 ............................................................................. 25

1821 Me. Laws 685-86, vol. 2, ch. 162, § 3 .......................................25

**Rules and Regulations:**

27 C.F.R. § 478.99(a) ........................................................................... 3

27 C.F.R. § 478.124(a) .......................................................................... 4

27 C.F.R. § 478.124(c)(1) ...................................................................... 4

**Legislative Materials:**

H.R. Rep. No. 90-1577 (1968) ........................................................2, 16

S. Rep. No. 89-1866 (1966) .............................................................2, 16

**U.S. Constitution:**

U.S. Const. amend. II ...................................................................... 6, 12

**Other:**

ATF, National Firearms Commerce and Trafficking Assessment (NFTCA),
vol. IV, part III .................................................................................28

J. Hammond Trumbull, *The Public Records of the Colony of Connecticut* (1850)
......................................................................................22, 24, 30

J. Hammond Trumbull, *True-Blue Laws of Connecticut and New Haven and the
False Blue-Laws Invented by the Rev. Samuel Peters* (1876) ...............................22

James Lucas, et al., *Proceedings for the Conventions of the Province of Maryland
Held at the City of Annapolis, in 1774, 1775, & 1776* (1836)................. 23-24, 31

John Bioren, *Laws of the Commonwealth of Pennsylvania* (1810) .......................25

Nathaniel Pope, *Laws of the Territory of Illinois* (1815) ......................................31

*The Colonial Laws of Massachusetts* (1890) ..........................................................24

*The Statutes at Large of Pennsylvania from 1682 to 1801* (James T. Mitchell & Henry Flanders eds., 1899) ...........................................................................31

Thomas Cooper, *The Statutes at Large of South Carolina* (1838) .................23, 31

Waverly K. Winfree, *The Laws of Virginia: Being a Supplement to Hening's The Statutes at Large* (1971) ................................................................................23

William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia* (1823)...............................................................................23, 31

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.14. The district court issued its final judgment on October 1, 2025. ROA.269. Plaintiffs filed their notice of appeal on October 28, 2025. ROA.270. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The question presented is whether the federal regulatory regime that channels each out-of-state handgun purchase through a federal firearms licensee in the purchaser's state of residence violates the Second Amendment.

## STATEMENT OF THE CASE

### A.    Statutory Background

Congress has enacted an interconnected framework of federal laws regulating the interstate firearm market. In particular, in 1968, Congress enacted two measures—the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 901(a)(1), 82 Stat. 197, 225 (Omnibus Crime Control Act), and the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213—to address, *inter alia*, "the serious problem of individuals going across State lines to procure firearms which they could not lawfully

obtain or possess in their own State and without the knowledge of their local authorities." S. Rep. No. 89-1866, at 19 (1966); *see also* H.R. Rep. No. 90-1577 at 6 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 4410, 4411 (The "principal purpose of [the statute] is to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders.").

To prevent this circumvention of state laws, Congress enacted several interconnected statutory provisions that, in tandem, generally allow an individual to purchase a firearm only from another resident of the state in which he resides. *See* 18 U.S.C. § 922(a)(3), (5), (b)(3). Section 922(a)(3) makes it unlawful for anyone other than a licensee to "transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State" except one acquired by bequest or intestate succession, or in conformity with section (b)(3). *Id.* § 922(a)(3). Section 922(b)(3) makes it unlawful for any licensee to "sell or deliver . . . any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located" with

exceptions for certain sales of "rifle[s] or shotgun[s]." *Id.* § 922(b)(3). This section does not prohibit the "loan or rental of a firearm to any person for temporary use for lawful sporting purposes." *Id.* § 922(b)(3)(B). This provision operates in concert with Section 922(a)(5), which provides that it shall be unlawful for any person other than a licensee "to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in . . . the State in which the transferor resides" except in the context of a bequest or intestate succession or a temporary loan for "lawful sporting purposes." *Id.* § 922(a)(5). With a few exceptions, interstate commerce in firearms is restricted to federal firearms licensees.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has enacted implementing regulations, including 27 C.F.R. § 478.99(a), which closely tracks Congress's limitations on interstate transfers of firearms by licensees in Section 922(b)(3).[1] ATF has also provided that licensees "shall

---

[1] Congress has authorized ATF to issue "such rules and regulations as are necessary to carry out" the provisions of Title 18 related to firearms. *See* 18 U.S.C. § 926(a).

not sell or otherwise dispose, temporarily or permanently, of any firearm to any [unlicensed transferee], unless the licensee records the transaction on a firearm transaction record, Form 4473." *Id.* § 478.124(a). Form 4473 establishes the purchaser or recipient's identity and eligibility to possess a firearm by documenting his or her "name, sex, residence address," "date and place of birth," "height, weight, and race," "country of citizenship," "State of residence," and a certification that he or she "is not prohibited by the Act" from transporting or shipping, receiving, or possessing a firearm in interstate or foreign commerce. *Id.* § 478.124(c)(1).

Under these provisions, a person who is eligible to possess a handgun may either purchase one from any resident of their State or purchase one from an out-of-state source by arranging for the handgun to be delivered to a federal firearms licensee in their state of residence, from whom the purchaser may retrieve the handgun. *See* 18 U.S.C. § 922(b)(3). These provisions thus do not bar anyone from obtaining a particular firearm but instead channel those transactions through a licensee in the individual's home state.

### B.    Factual Background

The plaintiffs here are two individuals, a licensed firearms retailer, and a national advocacy organization. *See* ROA.12-ROA.13. Plaintiff Elite Precision is a licensed firearms retailer located in Mansfield, Texas. ROA.12. Elite Precision alleges that, but for the statutory provisions, it would make sales to out-of-state customers who "desire to purchase handguns directly from Elite Precision but have refrained from doing so." ROA.12-ROA.13. Plaintiffs Tim Herron and Freddie Blish are two such potential customers. Both are firearms instructors who reside outside of Texas but frequently travel there for firearms training courses. *See* ROA.17-ROA.18. Both individual plaintiffs allege that the statutory restrictions on handgun purchases by out-of-state residents make it more expensive to purchase the firearm (due to the expense associated with having the firearm shipped to an in-state retailer) and impose a delay on their ability to take possession of the firearm. Herron further alleges that he purchases firearms outside of New Mexico—where he resides—"one or two times every year . . . causing an additional cost of $30-40 and a delay on taking possession." ROA.17.

## C.    Prior Proceedings

Plaintiffs brought this suit in the U.S. District Court for the Northern District of Texas alleging that the statutory provisions and implementing regulations facially violate the Second Amendment's guarantee that the "right of the people to keep and bear Arms, shall not be infringed." ROA.19 (quoting U.S. Const. amend. II). The district court held that these sales restrictions were constitutional and granted summary judgment for defendants. *See* ROA.267-ROA.268.

The district court noted that this Court had previously upheld the constitutionality of the challenged restrictions, *see* ROA.261 (citing *Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) (per curiam)), but that subsequent Supreme Court precedent, namely *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), had changed "the standard by which courts analyze Second Amendment questions," ROA.261; *see also Bruen*, 597 U.S. at 19. Under *Bruen*, a court considers whether the plain text of the Second Amendment covers the conduct and then, if so, whether the regulation "is consistent with the Nation's historical tradition of firearm regulation." ROA.260 (quoting *Bruen*, 597 U.S. at 24); *see also United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that a law must "comport with the

6

principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin'").

The district court held that the statutory provisions regulating sale to out-of-state residents do not infringe plaintiffs' Second Amendment rights. The court explained that the statutory provisions constitute a "condition on sale [that] incurs a slight delay on possession and increased cost" that regulates "only the ability to purchase [firearms] in specific and narrow circumstances," and thus did not trigger analysis under *Bruen*'s second step. ROA.263. The court noted that the challenged provisions "do not ban the sale of any kind of guns"; "[c]ustomers are not prohibited from shopping for or purchasing a firearm from an out-of-state dealer" provided they "arrange to have the firearm shipped from the state of sale to their home state." ROA.266. Instead, the provisions "backstop state licensing regimes by ensuring that individuals cannot dodge their home-state's licensing requirements by simply obtaining a gun from out of state." ROA.266 (alterations omitted) (quoting *United States v. Libertad*, 681 F. Supp. 3d 102, 111 (S.D.N.Y. 2023)); *see also* ROA.267 ("Congress found these conditions necessary to protect state laws" and to prevent citizens from being "able to avoid any regulations, such as background checks, required

7

by their state of residence—an affront on state sovereignty."). Analogizing to this Court's decision in *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), rather than the outright ban on sales by licensees to persons under the age of 21 that had been struck down in *Reese v. ATF*, 127 F.4th 583, 586 (5th Cir. 2025), the court concluded that "[t]he modest delay in taking possession [by] an individual who purchases a firearm and [a] slight increase in cost" does not violate the Second Amendment, ROA.266. Plaintiffs appealed.

## SUMMARY OF ARGUMENT

The district court correctly rejected plaintiffs' facial challenge and concluded that the challenged statutory provisions are constitutional under the Second Amendment. Laws imposing "conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626-27, 627 n.26 (2008). Such conditions and qualifications may infringe Second Amendment rights if they have the effect of denying citizens the ability to access their Second Amendment rights, *see, e.g.*, *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024), but the challenged provisions here do not remotely approach that threshold. The challenged provisions do not ban the sale of any type of gun and do not prohibit out of state customers from purchasing a firearm. They simply

8

require the purchaser to route the sale through a licensee in their home state — as one of the plaintiffs here has done on multiple occasions. The modest burdens created by the challenged provisions simply ensure that individuals cannot dodge state-law requirements by obtaining a firearm out of state and were enacted by Congress specifically in response to congressional findings of widespread trafficking of firearms in interstate commerce outside the bounds of state controls. And those burdens look nothing like those this Court considered in *Reese v. ATF*, 127 F.4th 583 (5th Cir. 2025), which addressed a provision that precluded a certain category of individuals from ever purchasing a firearm from a federally licensed dealer.

These modest requirements are likewise consistent with the Nation's historical tradition of firearm regulation. Plaintiffs do not apparently dispute that Congress may enact measures "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *McRorey*, 99 F.4th at 837 (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022)), as in the case of background checks or shall-issue licensing regimes. The same principle is at work here, as Congress enacted these provisions to prevent evasion of state law. And as

9

the Second Circuit recently explained in rejecting a similar challenge, there is a "Founding-era historical tradition of restricting arms transactions across borders" and the "burden imposed by such laws is precisely the type of burden imposed by" the laws at issue here. *United States v. Vereen*, 152 F.4th 89, 101 (2d Cir. 2025). Since the time of the Founding, States have regulated how firearms and gunpowder can be traded and transported, particularly across state lines. This historical tradition supports the conclusion that Congress may impose modest regulations on the ability of an individual to purchase a handgun outside his or her state of residence, particularly since many of the historical examples constituted a complete ban on sales outside the jurisdiction rather than limitations on when and how a buyer might take possession of a purchase.

Plaintiffs' attempt to distinguish these historical analogues is contrary to the Supreme Court's standard, most recently articulated in *United States v. Rahimi*, 602 U.S. 680, 700-02 (2024), that the government only needs to demonstrate that a current regulation is "consistent with the principles that underpin our regulatory tradition," and need not locate a "historical twin," *id.* at 692 (quotations omitted). Congress specifically enacted the provisions challenged here to ensure compliance with state

10

laws regulating firearm acquisition and to prevent potentially dangerous people from acquiring weapons. *See Vereen*, 152 F.4th at 102. There is plentiful historical support for such regulation and this Court should join the Second Circuit in concluding there is no Second Amendment violation here.

## STANDARD OF REVIEW

This Court reviews a grant of a motion to dismiss de novo. *See Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 253 (5th Cir. 2021) (per curiam).

## ARGUMENT

**THE FEDERAL INTERSTATE-TRANSFER REGULATORY FRAMEWORK IS NOT FACIALLY UNCONSTITUTIONAL UNDER THE SECOND AMENDMENT**

**A.** The district court correctly rejected plaintiffs' facial challenge, concluding that the challenged statutory provisions do not run afoul of the Second Amendment, and dismissed this case. *See United States v. Rahimi*, 602 U.S. 680, 693 (2024) (explaining that a facial challenge is "the most difficult challenge to mount successfully, because it requires [plaintiffs] to establish that no set of circumstances exists under which the [challenged provisions] would be valid" (quotations omitted)). The Second

Amendment declares that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. And while purchasing arms is not "keep[ing]" or "bear[ing]" arms, this Court has held that "the right to 'keep and bear arms' surely implies the right to purchase them." *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025).

"Like most rights," though, "the right secured by the Second Amendment is not unlimited." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Where the government regulates the right to keep and bear arms, it bears the burden of showing that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. "Why and how the regulation burdens the right are central to this inquiry." *Rahimi*, 602 U.S. at 692. That inquiry does not render constitutional only laws that mirror historical laws but instead requires courts to "reason[] by analogy" to conduct the historical inquiry. *Bruen*, 597 U.S. at 28. In doing so, courts should consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at

29). The government is required only to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30 (emphasis in original).

When it comes to regulations governing firearms sales, the Supreme Court has repeatedly emphasized that longstanding "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626-27, 627 n.26; *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27); *Rahimi*, 602 U.S. at 699 (quoting *Heller*'s "presumptively lawful" language).

This Court has explained that a commercial regulation may be unconstitutional if it is "put toward abusive ends." *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024) (quoting *Bruen*, 597 U.S. at 38 n.9). But absent such a showing, it is presumptively constitutional. *See id.* While neither the Supreme Court nor this Court have set forth the full range of criteria for "abusive ends," the Supreme Court has signaled that a regulation imposing "lengthy wait times in processing license applications or exorbitant fees" with the effect of "deny[ing] ordinary citizens their right to public carry"

13

may overcome the presumption of constitutionality. *Bruen*, 597 U.S. at 38 n.9; *see also McRorey*, 99 F.4th at 837.

This Court applied these principles in *McRorey*, where the Court considered a challenge to the federal background check system that required 18-to-20-year-olds to undergo expanded background checks that could delay their ability to purchase a firearm by up to 10 business days. 99 F.4th at 834-35. This Court emphatically rejected the argument that such delay on the commercial purchase of a firearm while a background check remains pending violates the Second Amendment. The Court observed that "[t]he right to 'keep and bear' can implicate the right to purchase," and thus that the government cannot "shoehorn[] restrictions on purchase into functional prohibitions on keeping." *Id.* at 838. But the Court explained that background checks "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" and that "[o]ur law is plain as can be that some amount of time for background checks is permissible." *Id.* at 837, 839 (quoting *Bruen*, 597 U.S. at 38 n.9). Although "there is some point at which a background check becomes so lengthy" as to be potentially unconstitutional, "a period of 10 days does not qualify." *Id.* at 840.

14

The same principles are at work here. As the district court correctly recognized, the challenged restrictions here "backstop[] state licensing regimes by ensuring that individuals can[not] dodge their home-state's licensing requirements by simply obtaining a gun from out of state." ROA.266 (alterations in original) (quoting *United States v. Libertad*, 681 F. Supp. 3d 102, 111 (S.D.N.Y. 2023)). The court also noted that the provisions may have the effect of potentially protecting customers from "unknowingly violat[ing] one of the passthrough states' laws" when transporting a newly-purchased firearm across multiple state lines. ROA.266 n.6. Indeed, addressing evasion of state law is precisely why Congress enacted these requirements.

Congress enacted the Omnibus Crime Control Act following a multi-year investigation of violent crime, which revealed "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce," which the "existing Federal controls . . . do not adequately enable the States to control . . . within their own borders through the exercise of their police power." Omnibus Crime Control Act, § 901(a)(1), 82 Stat. at 225. At the time of that enactment, existing federal controls already included requirements that firearms dealers obtain

15

licenses and keep customer records and made illegal transfer of firearms to

certain classes of people, including those convicted of crimes of violence.

Federal Firearms Act, Pub. L. No. 75-785, ch. 850, 52 Stat. 1250, 1250-52

(1938) (repealed 1968). Despite those measures, Congress specifically noted

"the serious problem of individuals going across State lines to procure

firearms which they could not lawfully obtain or possess in their own State

and without the knowledge of their local authorities." S. Rep. No. 89-1866,

at 19.  Hearings before Congress "demonstrated the ease with which

residents of a particular State, which has laws regulating the purchase of

firearms, can circumvent such laws by procuring a firearm in a neighboring

jurisdiction which has no such controls on the purchase of firearms." *Id.*

Accordingly, Congress enacted a comprehensive framework for regulating

interstate commerce in firearms, including the provisions at issue here, to

"reduce the likelihood that [firearms] fall into the hands of the lawless or

those who might misuse them." *Id.* at 1; *see also* Gun Control Act of 1968,

Pub. L. No. 90-618, 82 Stat. 1213; H.R. Rep. No. 90-1577, at 6, *as reprinted in*

1968 U.S.C.C.A.N. 4410, 4411 (The "principal purpose of [the statute] is to

strengthen Federal controls over interstate and foreign commerce in

16

firearms and to assist the States effectively to regulate firearms traffic within their borders.").

At the same time, the challenged provisions here "do not ban the sale of any kind of guns at all" and "do not even prohibit customers shopping out of state from acquiring a specific type of firearm," instead creating only a "modest delay in time and cost," as out-of-state customers "simply must arrange to have the firearm shipped from the state of sale to their home state." ROA.266. Indeed, one of the plaintiffs has explained that he regularly purchases firearms out of state—one to two times each year—and that the additional cost created by picking up the firearm in his home state is only $30-$40 dollars per firearm. ROA.17. The district court thus correctly concluded that there is no basis for treating the challenged requirements here as "functional prohibitions on keeping." ROA.266 (quotations omitted).

Plaintiffs here offer little to distinguish *McRorey*, which they correctly acknowledge a panel of this Court "is bound to follow," Br. 24 n.1, or any of the language from *Bruen* and *Heller* emphasizing that regulations on commercial sales are presumptively lawful. Nor do they provide any reasoned justification for why Congress would be powerless to ensure that

17

the interstate market in firearms does not become a tool for the evasion of state laws, the validity of which are not questioned here. Their argument instead largely hinges on their repeated mischaracterization of the challenged statutory provisions as a "purchase ban." *See, e.g.*, Br. 5 (calling it the "Nonresident Handgun Purchase Ban"). Relying on this characterization, they urge that this case is indistinguishable from *Reese*, in which this Court held unconstitutional a federal statute that completely prohibited sales by federal firearms licensees to 18-to-20-year-olds. 127 F.4th at 586; *see, e.g.*, Br. 23-24. In *Reese*, this Court held that such a restriction on firearms sales to a particular age group was "more than a 'functional prohibition,' it is an outright ban," 127 F.4th at 590 n.2 (quoting *McRorey*, 99 F.4th at 838), and that such a ban lacked any appropriate historical analogue, *id.* at 596-600.

Plaintiffs' reliance on *Reese*, and corresponding reference to a "ban" on sales from the challenged provisions here, cannot bear scrutiny. The statute at issue in *Reese* entirely prohibited sales by licensees to individuals in the covered age group; there were no circumstances in which such a sale could be completed. 127 F.4th at 586. Here, by contrast, anyone who may legally acquire a firearm and wishes to purchase from an out-of-state

18

dealer may do so; they face only the added step of taking delivery of the firearm through a licensee in their home state. That is why plaintiff Herron has been able to repeatedly purchase firearms from licensed dealers while traveling outside his home state. ROA.17. As this Court previously explained, the provisions at issue here thus "allow ample access to handguns by those who are permitted to possess and purchase them under state and local laws." *Mance v. Sessions*, 896 F.3d 699, 709 (5th Cir. 2018) (per curiam).[2] And plaintiffs' characterization of the background check requirement in *McRorey* as "not actually prevent[ing] *any* sales to an individual who could legally acquire a firearm," Br. 26, applies with equal force to the provisions here. The provisions change only the steps by which those sales must occur to ensure that those who purchase firearms are "law-abiding, responsible citizens," who are not evading state law in acquiring a firearm. *Bruen*, 597 U.S. at 38 n.9 (quotations omitted).

---

[2] As noted above, *Mance* was a challenge to the same regulatory regime at issue here. Because *Mance* was decided under a tiers-of-scrutiny approach that the Supreme Court rejected in *Bruen*, this Court's holding in *Mance* does not control this case, which is to be decided using the standards subsequently articulated in *Bruen* and *Rahimi*. *See, e.g., Reese*, 127 F.4th at 586 (finding prior Circuit precedent upholding restrictions on handgun sales should be reconsidered post-*Bruen*). But the nature of the challenged provisions themselves has not changed in any material way.

Plaintiffs repeated characterization of these provisions as a ban on "purchas[ing] handguns outside of their states of residence," Br. 2; *see, e.g.,* Br. 35 ("flat prohibition [on] acquiring handguns from out-of-state dealers"), is thus flatly wrong. Indeed, even plaintiffs begrudgingly acknowledge (Br. 26) the existence of a "workaround that allows interstate transfers." What plaintiffs disparage as a "workaround" is in fact the system Congress intended to ensure compliance with state laws.

Plaintiffs elsewhere hedge even more when describing the provisions as a ban on "acquiring a handgun *directly* from a licensed dealer in another state." Br. 26 (emphasis added); *see* Br. 1, 5, 6. But that characterization fares no better. Any modest restriction can be recharacterized as a ban on purchase under certain circumstances. For example, the plaintiffs in *McRorey* could have recharacterized the statute at issue there as a ban on taking immediate possession of a firearm during the pendency of a background check, but as this Court recognized, there is no Second Amendment right to take delivery of a firearm without delay. *McRorey*, 99 F.4th at 839 (upholding background checks that include a 10-day delay); *see also B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) ("[G]un buyers have no right to have a gun store in a particular location . . . ."

20

(quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (en banc))).

Nor do plaintiffs fairly grapple with the modest burdens imposed by the provisions at issue here. A delay of a few days is substantially less than the delay of up to 10 business days this Court considered in *McRorey*. And plaintiffs' assertions that a transfer to a home state licensee can add $30-$40 dollars in costs not only depends on those licensees' exercise of "legitimate discretion," *McRorey*, 99 F.4th at 839, but also does not come close to creating an effective ban on these transfers. *See Bezet v. United States*, 714 F. App'x 336, 341 (5th Cir. 2017) (concluding that a $200 firearms tax is a "relatively light burden[]").

**B.** Plaintiffs' assertions (Br. 32-52) that the challenged provisions here are not "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, are likewise mistaken. As the Second Circuit recently explained in rejecting a similar challenge, there is a substantial "Founding-era historical tradition of restricting arms transactions across borders," as well as "Founding-era laws . . . [that] sought to ensure compliance with proper channels of firearm acquisition and prevent potentially dangerous individuals from acquiring weapons,"

21

including through "generally applicable restrictions." *United States v. Vereen*, 152 F.4th 89, 101-02 (2d Cir. 2025), *cert. denied sub nom. Perez v. United States*, No. 25-6198, 2026 WL 79986 (U.S. Jan. 12, 2026).

Since the time of the Founding, States have regulated how firearms and gunpowder can be traded and transported, particularly across state lines. *See, e.g., Teixeira*, 873 F.3d at 685 ("[C]olonial governments substantially controlled the firearms trade."). From the seventeenth century through the Founding, numerous colonies and States had direct or indirect prohibitions on the sale of firearms to individuals not from the jurisdiction. In 1642, Connecticut banned the sale of firearms by its residents outside the colony. *Id.* (citing 1 J. Hammond Trumbull, *The Public Records of the Colony of Connecticut* 138-39, 145-46 (1850)). Connecticut again banned all sales of firearms to "any person inhabiting out[side] of this jurisdiction" in 1650 to address the problem that those they deemed dangerous, Native Americans, had been able to acquire firearms. J. Hammond Trumbull, *True-Blue Laws of Connecticut and New Haven and the False Blue-Laws Invented by the Rev. Samuel Peters* 92 (1876).

Virginia followed Connecticut's lead when it adopted a 1676 law providing that all persons were at "liberty to sell armes and ammunition to

22

any of his majesties loyal subjects inhabiting *this colony.*" 2 William Waller

Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia* 403

(1823) (emphasis added). But that liberty to sell arms did not extend to

selling arms to those not from the colony. *Id.* Virginia also created a

registration regime that required the recording of all new arrivals to the

colony, including their arms and munitions. Virginia Act of Feb. 27, 1631,

Act LVI, 1 Henning, at 174-75; Articles at the Surrender of the Countrie of

Virginia, Mar. 22, 1651, 1 Henning, at 365. In 1720, Virginia also restricted

residents of the counties of Spotsylvania and Brunswick from transporting

firearms outside the county. Waverly K. Winfree, *The Laws of Virginia: Being

a Supplement to Hening's The Statutes at Large* 182 (1971) ("An Act for

Erecting the Countys of Spotsylvania and Brunswick and granting certain

Exemption and Benefits to the Inhabitants thereof (1720)"). South Carolina

completely banned the export of all firearms, including through sale. 3

Thomas Cooper, *The Statutes at Large of South Carolina* 101 (1838) (citing No.

408, § IV (1719)). Maryland did the same in 1776, banning the export of all

firearms unless the owner was permanently relocating outside the

jurisdiction. James Lucas, et al., *Proceedings for the Conventions of the Province

of Maryland Held at the City of Annapolis, in 1774, 1775, & 1776*, at 146-47

23

(1836). New York was an outlier in that it went even further—banning entirely the private trade of gunpowder, lead, and guns within the colony. Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Guns in New Netherland by Private Persons, 1652 N.Y. Laws 128.

Commercial regulations of the colonies and early States also extended to the export and sale of gunpowder—a critical component of firearms use—the regulation of which necessarily affected the ability to use firearms for self-defense. Massachusetts and Connecticut prohibited the export of gunpowder without a license. *See The Colonial Laws of Massachusetts* 126 (1890) (1651 statute) ("[N]o person . . . shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates . . . ."); 15 J. Hammond Trumbull, *The Public Records of the Colony of Connecticut* 191 (1890) (1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"). And in 1795, Pennsylvania adopted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not

24

appropriately marked. 3 John Bioren, *Laws of the Commonwealth of Pennsylvania* 240-44 (1810).[3]

This historical tradition supports the conclusion that Congress may impose modest regulations on the ability of an individual to purchase a handgun outside his or her state of residence, particularly since many of the historical examples constituted a complete ban on sales outside the jurisdiction rather than limitations on when and how a buyer might take possession of a purchase. As the Second Circuit explained, "historical analogues, far more expansive and burdensome than the law at issue here, reflect a longstanding tradition of regulating firearm transactions, and even possession, in order to keep weapons out of the hands of those deemed dangerous." *Vereen*, 152 F.4th at 103. For example, "the Connecticut and

---

[3] There is also historical support for the idea that firearms sales may lawfully be channeled through licensees in one's state of residence. Both Massachusetts and Maine prohibited the sale of any musket or pistol unless it was approved, marked, and stamped by a government official. *See* 1814 Mass. Acts 464, ch. 192, §2; 1821 Me. Laws 685-86, vol. 2, ch. 162, § 3. New Hampshire created a state gunpowder inspection regime to examine manufacturing and storage sites. Act of June 21, 1820, ch. XXV, 1820 N.H. Laws 274, 274-76. And New Jersey required all gun powder manufacturers to obtain a license. 1811 N.J. Laws 300, An Act to Regulate Gun Powder Manufactories and Magazines Within this State, Section 1.

Virginia laws enacted generally-applicable restrictions—prohibiting *any* sale of weapons outside the jurisdiction or *any* possession of more-than-necessary weapons three miles from an English plantation—to prevent certain individuals from acquiring weapons." *Id.* (emphasis in original).

Plaintiffs argue that the above historical examples are not sufficiently analogous. Br. 32-52. But their arguments simply misapply the standard the Supreme Court has articulated and ignore entirely the reasons the challenged provisions exist. The Supreme Court has made clear that the historical analysis is about "consisten[cy] with the principles that underpin our regulatory tradition," not finding identical statutes from history. *Rahimi*, 602 U.S. at 692. The Court has been equally clear that "the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs,'" *Bruen*, 597 U.S. at 27-28 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819)), and courts must interpret it so as not to leave a "law trapped in amber," *Rahimi*, 602 U.S. at 691. And this Court has recognized that it "must ascertain whether the challenged regulation 'impose[s] a comparable burden on the right of armed self-defense' to that imposed by a historically recognized regulation." *United States v. Quiroz*,

26

125 F.4th 713, 718 (5th Cir. 2025) (alteration in original); *see also id.* (upholding statute that restricts the ability of an individual under indictment to ship, transport, or receive a firearm even though the government "d[id] not identify a historical law that specifically prevented acquisition of firearms by those under indictment").

Under the Supreme Court's and this Court's precedents "*why* and *how* the regulation burdens a citizen's right to armed self-defense are central to the inquiry." *Quiroz*, 125 F4th at 717-18. In keeping with the recognized historical regulatory tradition, the challenged provisions at issue here are commercial firearms regulations aimed at ensuring that only law-abiding citizens may acquire firearms by placing limits on sales to individuals from outside the jurisdiction. As this Court has previously recognized, when it enacted the Omnibus Crime Control Act and the Gun Control Act of 1968, Congress sought to address concerns about public safety and that individuals deemed dangerous might evade state laws designed to ensure only law-abiding citizens could acquire firearms by purchasing them outside the jurisdiction. *See Mance*, 896 F.3d at 705-06. Congress was specifically concerned that "the existing Federal controls over [widespread] traffic [in arms did] not adequately enable the States to

27

control this traffic within their own borders through the exercise of their police power." Omnibus Crime Control Act § 901(a)(1), 82 Stat. at 225 (1968).[4] To prevent individuals, many of whom were criminals or juveniles, from evading the laws of their own state, Congress funneled individuals' handgun purchases through federal firearms licensees in their home state, on the theory that each federal firearms licensee could be held accountable for ensuring that the purchaser is eligible to acquire and possess the handgun they seek to acquire in their state of residence. *Mance*, 896 F.3d at 706-08.

The historical laws cited by the government show that there is a tradition of government regulation over the commercial trade in firearms due to concerns that the arms might fall into dangerous hands; and courts throughout the country agree. *See, e.g.*, *Vereen*, 152 F.4th at 100-01; *Teixeira*, 873 F.3d at 685-87 (citing a Connecticut law banning the sale of firearms by

---

[4] As noted in the government's briefing below, this continues to be a serious problem in the United States. Between 2017 and 2023, 28% of firearms used or suspected of being used in a crime were recovered in a state different from where it was purchased. ATF, National Firearms Commerce and Trafficking Assessment (NFTCA), vol. IV, part III, at 10. Firearms trafficking poses a particular safety issue because it is a reliable source of firearms for gangs and cartels in the United States.

its residents outside the colony and various laws banning commerce in firearms with Native Americans to conclude that colonial governments controlled the firearms trade including by imposing bans and geographical restrictions on the sale of arms); *see also United States v. Holton*, 639 F. Supp. 3d 704, 711-12 (N.D. Tex. 2022); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1211-12 (S.D. Cal. 2023).

Plaintiffs nowhere acknowledge or address this manifest purpose for the challenged provisions, much less dispute that ensuring compliance with legal requirements is a legitimate reason to enact regulations on commercial sales. The same principle animated the Supreme Court's approval of shall-issue licensing regimes, which impose conditions and qualifications on the commercial sale of firearms to ensure that firearms do not fall into the wrong hands, *see Bruen*, 597 U.S. at 38 n.9, and this Court's approval of background check provisions, *see McRorey*, 99 F.4th at 837-39. Plaintiffs instead respond by suggesting that some of the historical laws at issue were designed to address different concerns. *See, e.g.*, Br. 37-38, 41-43, 48-50. Yet plaintiffs themselves acknowledge that at least some of the restrictions on sales were designed to prevent firearms from falling into the hands of individuals from outside the jurisdiction perceived to be

29

dangerous, Br. 48, 51, as the Second Circuit likewise recognized, *see Vereen*, 152 F.4th at 102-03. And more generally, plaintiffs' arguments simply rehash the demand for an "historical twin" that the Supreme Court has rejected. *Bruen*, 597 U.S. at 30 (emphasis omitted). The salient point is that regulations restricting the transfer of firearms to ensure they are obtained by law-abiding citizens are entirely "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

That point is underscored by the far more modest burdens imposed by the challenged provisions as compared to the historical analogues. As discussed, the burdens imposed by these provisions—which do not preclude acquisition of a handgun from an out-of-state licensee—are minimal. *See Mance*, 896 F.3d at 709 (explaining the burden of the provisions challenged here is "de minimis"). The historical laws, by contrast, were not so restrained. *See Vereen*, 152 F.4th at 103 (explaining that the above-reference historical analogues were "far more expansive and burdensome than the law at issue here"). Various laws entirely foreclosed commercial transactions in firearms to non-residents, *see, e.g., Teixeira*, 873 F.3d at 685 (citing 1 Trumbull, *The Public Records of the Colony of Connecticut*, *supra*, at 138-39, 145-46) ("Connecticut banned the sale of firearms by its

30

residents outside the colony"), banned the export of firearms, *see, e.g.*, Lucas et al., *supra*, at 147 (banning the export of firearms for commercial purposes), 4 Thomas Cooper, *The Statutes at Large of South Carolina*, 109-10 (1838) (1760 law banning the export of firearms), and banned the sale of firearms to entire classes of people who were not citizens of the colony or state because that could result in firearms getting into the hands of those deemed dangerous. *See, e.g.*, Act of Oct. 22, 1763 reprinted in 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319 (James T. Mitchell & Henry Flanders eds., 1899) (banning the sale of firearms to Native Americans); An Act to Regulate Trade and Intercourse with the Indian Tribes and to Preserve Peace on the Frontiers, § 9, 1802 Miss. Laws 593 (Samuel Terrell 1807) (same); 1 Nathaniel Pope, *Laws of the Territory of Illinois* at 304 (1815) (same); 2 Hening, *supra*, at 336-37 (criminalizing the mere possession of more arms and ammunition than one could need for personal use within a Native American town or more than three miles from an English plantation). Even assuming these laws were motivated by a desire to keep weapons inside a particular colony for purposes of self-defense, Br. 48, they nonetheless demonstrate that it is consistent with historical tradition for a jurisdiction to restrict sales of firearms to non-residents. *See Vereen*, 152

31

F.4th at 101 ("Taken together, these laws demonstrate a Founding-era historical tradition of restricting arms transactions across borders. The burden imposed by such laws is precisely the type of burden imposed by [the laws at issue here]."); *see also id.* at 102 (explaining that historical analogues "similarly sought to ensure compliance with proper channels of firearm acquisition and prevent potentially dangerous individuals from acquiring weapons").

In short, plaintiffs' approach of disregarding the fundamental principles animating both the challenged provisions and our tradition of firearms regulation was explicitly rejected in *Rahimi*. *See* 602 U.S. at 700-02; *see also id.* at 702 (Sotomayor, J., concurring) (The methodology set out in *Rahimi* is designed to "permit[] a historical inquiry calibrated to reveal something useful and transferable to the present day."). Nor can it be reconciled with this Court's precedent. Plaintiffs provide no reason to conclude that Congress's imposition of modest requirements like the challenged provisions here to ensure that those purchasing firearms from out-of-state licensees are complying with the law of their home state infringe Second Amendment rights.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

RYAN R. RAYBOULD
*United States Attorney*

BRAD HINSHELWOOD
*s/ Laura E. Myron*

LAURA E. MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4819*
*Laura.e.myron@usdoj.gov*

May 2026

33

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2026, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the Fifth Circuit by using the appellate CM/ECF system.

*s/ Laura E. Myron*

LAURA E. MYRON

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,368 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Laura E. Myron*
LAURA E. MYRON