**No. 25-11206**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ELITE PRECISION CUSTOMS L.L.C.; TIM HERRON; FREDDIE BLISH;
FIREARMS POLICY COALITION, INCORPORATED, A NONPROFIT CORPORATION,

*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; TODD
WALLACE BLANCHE, ACTING U.S. ATTORNEY GENERAL; ROBERT CEKADA,
DIRECTOR, U.S. BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND
EXPLOSIVES,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Northern
District of Texas, Case No. 4:25-cv-44, the Honorable
Mark Timothy Pittman

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Cody J. Wisniewski
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, Nevada 89149
Telephone: (615) 955-4306
Facsimile: (615) 334-0463
cwi@fpcafhq.org

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave.,
N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

*Elite Precision Customs, LLC v. BATFE*, No. 25-11206

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal. Additionally, Elite Precision Customs, LLC and Firearms Policy Coalition, Inc. are nongovernmental corporations. Neither has a parent corporation and nor does any publicly held corporation own 10% or more of the stock of either.

1. **Plaintiffs-Appellants:**

   **Elite Precision Customs L.L.C.; Tim Herron; Freddie Blish; Firearms Policy Coalition, Incorporated, a nonprofit corporation**

   Counsel:

   David H. Thompson
   Peter A. Patterson
   William V. Bergstrom
   COOPER & KIRK, PLLC
   1523 New Hampshire Ave., N.W.
   Washington, D.C. 20036
   Telephone: (202) 220-9600
   Facsimile: (202) 220-9601
   dthompson@cooperkirk.com

i

ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

Cody J. Wisniewski
FPC Action Foundation
5550 Painted Mirage Road
Suite 320
Las Vegas, Nevada 89149
Telephone: (615) 955-4306
Facsimile: (615) 334-0463
cwi@fpcafhq.org


**2.    <u>Defendants-Appellees</u>:**

**Bureau of Alcohol, Tobacco, Firearms, and Explosives;
Todd Wallace Blanche, Acting U.S. Attorney General;
Robert Cekada, Director, U.S. Bureau of Alcohol,
Tobacco, Firearms, and Explosives**


<u>Counsel</u>:

Laura Myron
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
laura.e.myron@usdoj.gov

Sean Janda
U.S. Department of Justice
Civil Division, Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
sean.r.janda@usdoj.gov

Samuel Bean
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, DC 20005
(202) 405-9619
samuel.b.bean2@usdoj.gov

3.    **District Court Participants:**

James R McHenry, III, in his official capacity as Acting
Attorney General of the United States

Marvin G. Richardson, in his official capacity as the Acting
Director of the Bureau of Alcohol, Tobacco, Firearms and
Explosives

*Defendants*

R. Brent Cooper
Cooper & Scully PC
900 Jackson Street, Suite 100
Dallas, TX 75202
Telephone: (214) 712-9501
Fax: (214) 712-9540
brent.cooper@cooperscully.com

*Counsel for Plaintiffs*

Andrew Warden
1100 L St NW
Suite 7301
Washington, DC 20005
(202) 616-5084
andrew.warden@usdoj.gov

*Counsel for Defendants*

Hon. Mark Timothy Pittman
*District Court Judge*

/s/ David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ...........................................i

TABLE OF AUTHORITIES...................................................................vi

   I.    The Nonresident Handgun Purchase Ban Is Not "Presumptively Lawful."...........................................................2

   II.   The Nonresident Handgun Purchase Ban Is Not Historically Justified. ................................................................10

CONCLUSION ....................................................................................18

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ...................................................................... 7

*Harper v. Virginia State Board of Elections*,
    383 U.S. 663 (1966) ...................................................................... 9

*McRorey v. Garland*,
    99 F.4th 831 (5th Cir. 2024) ......................................................... 5

*Nat'l Rifle Ass'n v. BATFE*,
    714 F.3d 334 (5th Cir. 2013) ..................................................... 7, 8

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    597 U.S. 1 (2022) ........................................................ 1, 3, 4, 5, 9

*Reese v. BATFE*,
    127 F.4th 583 (5th Cir. 2025) ................................................ 8, 9, 10

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ................................................. 17, 18

*United States v. Holton*,
    639 F. Supp. 3d 704 (N.D. Tex. 2022) ........................................ 18

*United States v. Serrano*,
    651 F. Supp.3d 1192 (S.D. Cal. 2023) ........................................ 18

*United States v. Vereen*,
    152 F.4th 89 (2d Cir. 2025) ........................................................ 17

**Codes**

18 U.S.C. § 922(b)(3)(A) ................................................................... 7

Under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), a law that regulates conduct covered by the "plain text" of the Second Amendment is presumptively unconstitutional, and the Government bears the burden of justifying such a regulation, if at all, by demonstrating that it is consistent with this Nation's history of firearm regulation. The Government's brief makes a hash of this straightforward analysis. First, the Government does not deny (at least not expressly) that the Nonresident Handgun Purchase Ban regulates conduct covered by the plain text of the Second Amendment. Nevertheless, it insists the Ban evades meaningful scrutiny because it does not amount to a functional prohibition on the exercise of the right. This maneuver is contrary to *Bruen*, which made clear that whenever "the Second Amendment's plain text covers an individual's conduct," a challenged regulation will be constitutional "*[o]nly if*" the Government can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearms regulation." *Id.* at 17 (emphasis added). The analysis is not watered down for regulations that fall short of a flat ban. Second, the Government argues that the Nonresident Handgun Purchase Ban is historically justified by relying on the same laws which

1

the district court found persuasive below. But in doing so, the Government ignores Plaintiffs' opening brief in which these statutes were discussed in great detail. It provides the same readings of these historical laws that it offered below, without addressing Plaintiffs' criticisms that demonstrate that most, if not all, of these readings are seriously flawed. This Court should reverse the decision below and remand with instructions to enter judgment in Plaintiffs' favor because the Government has failed to carry its burden.

## I.    The Nonresident Handgun Purchase Ban Is Not "Presumptively Lawful."

The district court held that the Ban was constitutional because, as a "condition [] [or] qualification[] on the commercial sale of arms," it does not implicate the Second Amendment's plain text. Record Excerpts, Doc. 27 at 265 (Feb. 4, 2026) ("ROA."). The Government defends this reasoning in part. While it avoids discussing the "plain text" entirely, it nevertheless argues that as a "condition[]" or "qualification[]," the Ban is "presumptively constitutional" unless Plaintiffs can demonstrate it is being put to an "abusive end[]." Brief of Appellees, Doc. 40 at 13 (May 6, 2026) ("Gov't Br.").

Under *Bruen*, there are only two relevant questions: does the proposed course of conduct fall within the "plain text" of the Second Amendment and, if so, has the Government demonstrated that the restriction is "consistent with the Nation's historical tradition of firearm regulation[?]" 597 U.S. at 24. The Government nowhere suggests that its "presumptively constitutional" argument is based in history (which it discusses separately in its brief) and, as *Bruen* makes clear, a historically justified regulation is constitutional full stop, not merely "presumptively." The Government must, therefore, be arguing that the nature of the restriction at issue—as a putative "condition" or "qualification" on a commercial sale—takes it outside of the realm of the Second Amendment's plain text, even if it does not come out and say so directly. The problem with its failure to make this point clear is that the Government largely fails to respond to Plaintiffs' lengthy argument in their opening brief that treating this language from *Heller* as creating an exception to the scope of the Amendment's "plain text" is without basis in the Second Amendment, Supreme Court precedent, or this Court's precedent. *See* Brief of Pls.-Appellants, Doc. 26 at 18–31 (Feb. 4, 2026)

3

("Pls.' Br."). Those arguments are, on their own, ample basis to reject the Government's attempt to avoid historical scrutiny.

Rather, taking it as a given that if a regulation can be described as a "condition or qualification" on commercial sale that is not being put to an "abusive end" then it is shielded from scrutiny, the Government argues that on those (unsupported) premises this case should be resolved in its favor. But this argument also fails on its own terms because the Ban is not a mere "condition" or "qualification" on the commercial sale of arms. Rather, it has the effect of flatly prohibiting American citizens from acquiring handguns directly from dealers outside of their state of residence. Whether it is not a condition or qualification at all or it is a condition or qualification that has been put to an abusive end, the Nonresident Handgun Purchase Ban cannot be justified even on the Government's own terms.

The Government places much weight on the "abusive end" test as a threshold requirement, going so far as to insinuate that the Supreme Court has implicitly endorsed it, even if it has not fleshed it out fully. *See* Gov't Br. at 13–14. But the portion of the *Bruen* opinion the Government cites for support, footnote nine, was the Court's discussion of the limits

4

of its dicta regarding shall-issue carry licensing regimes. *Id.*; *see Bruen*, 597 U.S. at 38 n.9. While it is fair to say that *Bruen* suggested that such licensing regimes, which have nothing to do with the "commercial sale of arms," are valid unless put to "abusive ends," the Government overreads the opinion to extend that reasoning to require such a showing in any case involving a regulation that can be cast as a sales restriction. *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), on which the Government heavily relies, is not to the contrary, since it viewed the regulation before it—delaying sales during the pendency of an extended background check, but permitting sales to anyone who is not disqualified from acquiring a firearm—as having been effectively encompassed by *Bruen*'s footnote nine because it barred only those who failed a background check, something footnote nine specifically addressed. *Id.* at 837. The same is not true here, where the law instead acts as a flat prohibition on sales even to those who *can* lawfully acquire and possess arms, merely because they would like to acquire an arm outside the state of their residence.

The Government attempts to fit the Ban into a *McRorey*-shaped box by arguing that the Ban does no more than "backstop[] state licensing

5

regimes," Gov't Br. at 15 (quoting ROA.266), and faults Plaintiffs for failing to "provide any reasoned justification for why Congress would be powerless to ensure the interstate market in firearms does not become a tool for the evasion of state laws, the validity of which are not questioned here," *id.* at 17–18. The Government repeatedly emphasizes that it views the ban as a modest way of ensuring that state regulatory regimes are complied with during commercial firearms transactions, bemoaning that "[a]ny modest restriction can be recharacterized as a ban on purchase under certain circumstances," *id.* at 20, and criticizing Plaintiffs for "disparag[ing]" the only way currently to acquire a firearm from an out-of-state dealer, by structuring the transaction through an in-state dealer and paying a premium as a "workaround" when that "is in fact the system Congress intended to ensure compliance with state laws," *id.*

The Government's arguments lack merit. As an initial matter, it does not matter whether Congress thought the law would help combat evasion of state gun laws, apart from a showing (that the Government fails to make) that the Nonresident Handgun Purchase Ban is consistent with the Nation's history of firearm regulation. Any conclusion to the contrary would be an improper return to the sort of means-ends scrutiny

that *Bruen* rejected. And in any event, federal law already charges licensed dealers with ensuring their sales comply with the laws of the purchaser's state when selling long guns to residents of other states, *see* 18 U.S.C. § 922(b)(3)(A); presumably, the same requirement could be applied to handgun sales.

It also does not matter whether the Nonresident Handgun Purchase Ban is characterized as a mere "restriction" or an outright "ban." Gov't Br. at 20. The question, again, is whether a challenged law is consistent with the Nation's history of firearms regulation, regardless of how it is characterized. *Heller* and *Bruen* deal with substance, not labels. For example, while the law at issue in *Heller* banned the possession of handguns, it allowed the possession of long guns. So, was the law better characterized as a ban or a mere regulation on the types of arms that could be possessed? *Heller* did not concern itself with such questions, but rather summarily rejected the notion that "it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns), is allowed." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008). In other words, "restating the Second Amendment right in terms of what IS LEFT after the regulation rather

7

than what EXISTED historically … is exactly backward from *Heller*'s reasoning." *Nat'l Rifle Ass'n v. BATFE*, 714 F.3d 334, 345 (5th Cir. 2013) (Mem.) (Jones, J., dissenting from denial of rehearing en banc).

In any event, if it did matter, the Nonresident Handgun Purchase Ban is a ban—it prohibits Americans from acquiring a handgun directly from a dealer outside of their home state. It is not like the law at issue *McRorey*, which only prohibited ultimate firearm acquisition by individuals who were already prohibited from exercising their rights under the Second Amendment anyway. And that there is a "workaround" (which takes both time and money) is no answer. There was a "workaround" in *Reese v. BATFE*, 127 F.4th 583 (5th Cir. 2025), too—an 18-to-20-year-old barred by the challenged law from buying a handgun from a licensed dealer could have purchased from or been gifted a handgun by someone other than a dealer. And the Government accordingly argued, similar to its argument here, that the Second Amendment did not " 'establish[] a right' to purchase firearms 'at any time from any source.' " *Id.* at 589. But this Court nevertheless characterized the law as a ban. *See, e.g., id.* at 596 (noting that the Government had the "burden [to show] that banning eighteen-to-twenty-

8

year-olds from purchasing handguns is consistent with our Nation's historical tradition of firearm regulation"). In *Reese* too, the "workaround" was the direct result of "the system Congress intended," Gov't Br. at 20, and that did not matter at all.

Indeed, these arguments *cannot* matter under *Bruen* given the Supreme Court's emphatic rejection of means-ends scrutiny in Second Amendment cases. *See Bruen*, 597 U.S. at 19. The very same is true of the question of how "severe" the burden is, *i.e.*, how difficult it is to access the "workaround" to the scheme or how much it typically adds to the price. *See* Gov't Br. at 21. The Government stresses that it views the burden as light, calling it "[a] delay of a few days" and disparaging a $30–$40 fee as "not com[ing] close" to severe enough to raise constitutional scrutiny. *Id.* This argument would not pass muster in other constitutional contexts, and it should not here either. In *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966), for example, the Supreme Court invalidated a poll tax of $1.50, reasoning that it did not matter "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it," *id.* at 668. Aside from the fact that Plaintiffs obviously do not agree that the burden is

9

"light," the idea that such considerations, formerly the province of the old "step two" Second Amendment analysis pre-*Bruen*, should be re-introduced as a threshold consideration post-*Bruen* is antithetical to the text-and-history analysis the Supreme Court has prescribed. And in any event, what might be a "light" burden in some contexts is not always so. A person who is not in his or her home state but nevertheless needs to acquire a handgun for protection without returning home will not find the burdens imposed by the Ban to be as "modest" as the Government apparently does.

## II. The Nonresident Handgun Purchase Ban Is Not Historically Justified.

Properly considered, the law at issue is a Ban on a customer acquiring a firearm from any dealer located outside of his state of residence. Whether or not that restriction is valid, under *Bruen, must* depend upon whether it is historically justified. *See Reese*, 127 F.4th at 590 n.2 ("We fail to see how a purchase ban unknown at the time of the founding can evade *Bruen* analysis.").

The Government, effectively acknowledging the true nature of the Ban *as* a ban, argues that it is historically justifiable because, "[f]rom the seventeenth century through the Founding, numerous colonies and

10

States had direct or indirect prohibitions on the sale of firearms to individuals not from the jurisdiction." Gov't Br. at 22. Every single piece of evidence the Government offers in support of this view, however, has already been addressed by Plaintiffs and shown to be an inappropriate analogue. And yet, aside from two extremely general references to the whole of Plaintiffs' historical argument, *see id.* at 26 ("Plaintiffs argue that the above historical examples are not sufficiently analogous."); *id.* at 29–30, the Government entirely fails to respond to Plaintiffs and thus fails to sufficiently meet its burden under *Bruen.*

Taking them in order, the Government begins with a pair of Connecticut laws (dating to 1642 and 1650) which it claims "banned the sale of firearms by its residents outside the colony" in an attempt "to address the problem that those they deemed dangerous, Native Americans, had been able to acquire firearms." *Id.* at 22. But Plaintiffs already explained that these laws came far too early to be probative (both over a century before the enactment of the Second Amendment), especially given that between 1642 and 1791 perhaps the most salient change the colonies experienced was the shift from existing as competitive neighboring entities to forming a single sovereign Nation.

11

Pls. Br. at 45–46. And furthermore, even situated in a more Balkanized America, the 1642 law did not actually prevent sales to other English colonies, and the 1650 law did not prevent sales anywhere when the sale was conducted by a licensed individual. *Id.* at 48–49. The Government does not respond to Plaintiffs' lengthy discussion of these statutes.

The Government next cites a 1676 Virginia law that it characterizes as "follow[ing] Connecticut's lead" by "providing that all persons were at 'liberty to sell armes and ammunition to any of his majesties loyal subjects inhabiting *this colony*.' " Gov't Br. at 22–23 (quoting 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia* 403 (1802)) (emphasis in Government brief). But again, Plaintiffs already covered this. The law did not proscribe sales at all—"a grant of authority to sell to 'loyal subjects inhabiting this colony' is not a ban on selling *outside* of the colony." Pls.' Br. at 50. And the better read, given that the law was passed one year after Bacon's Rebellion, was that the law reflects, at most, some background prohibition on sales to *disloyal* subjects within the colony. *Id.* Again, the Government does not even mention Plaintiffs' argument on this score.

The Government's whole historical discussion proceeds the same way—it asserts that statutes reached activity or indicated a mode of firearm regulation that, on closer examination, cannot be supported by the actual historical text, and it never interacts with Plaintiffs' arguments where they have already identified the problems with these analogues. Its 1631 Virginia law was not a "registration regime," Gov't Br. at 23, but a census law which required periodic accountings of all manner of people, equipment, and goods located within the colony, Pls.' Br. at 44. In 1720, Virginia did not "restrict[] residents of the counties of Spotsylvania and Brunswick from transporting firearms outside the county," nor did South Carolina in 1719 "completely ban[] the export of all firearms, including through sale." Gov't Br. at 23. In both cases, the laws at issue only applied firearms provided by the government itself. They were irrelevant to commerce in privately owned arms. Pls.' Br. at 41–42. The Government cites a 1776 Maryland law that does in fact appear to have gone further and applied even to removal of private arms, Gov't Br. at 23, but it does so without acknowledging the obvious point that the Nation was in the middle of the Revolutionary War at that time, which likely explains the impetus for that aberrational restriction (and

13

defeats any analogy to the Ban today), Pls.' Br. at 42–43. *See Bruen*, 597 U.S. at 63 n.26. And the Government's reliance on a New York law that it describes itself as an "outlier" that "bann[ed] entirely the private trade of gunpowder, lead, and guns within the colony," is deeply puzzling, Gov't Br. at 24, given that as Plaintiffs pointed out (and the Government again ignores), the law appears to have been only targeted at "illegal trade" in arms, cannot have possibly been consistent with the Second Amendment if it in fact had the scope the Government ascribes to it, and anyway is necessarily conjectural given that the text of the law has been lost to history, Pls.' Br. at 51–52.

The Government's discussion of gunpowder laws, which it asserts were part of the same tradition as these firearm laws discussed above, offers more of the same. *See* Gov't Br. at 24. The 1651 Massachusetts law which the Government says "prohibited the export of gunpowder without a license," *id.*, was, as Plaintiffs have already demonstrated, directed at preventing the embezzlement of public stores of gunpowder and did not restrict ordinary trade, Pls.' Br. at 39–40. And the 1775 Connecticut law which the Government cites next, Gov't Br. at 24, was another Revolutionary War enactment focused on increasing the availability of

14

powder for the war effort both, as the Government highlights, by restricting its export *and*, as the Government ignores, by mandating the creation of additional powder factories in any town that did not already have one, Pls.' Br. at 40–41.

The Government cites three laws, a 1795 Pennsylvania law requiring gunpowder stored in public magazines to be "proved" and marked, and Maine (1821) and Massachusetts (1814) laws requiring firearm barrels be "proved," as evidence that "[t]here is … historical support for the idea that firearms sales may lawfully be channeled through licensees in one's state of residence." Gov't Br. at 24, 25 n.3. But none of those laws required individuals to purchase firearms or gunpowder in their home states. Rather, as Plaintiffs have already explained, those laws were focused on preventing the sale of firearms or powder with latent defects. Pls.' Br. at 36–39. So too, the 1820 New Hampshire law which "created a state gunpowder inspection regime," Gov't Br. at 25 n.3, had no impact on commerce across colonial borders and dealt instead with quality control for powder. Pls.' Br. at 37–38. And despite the fact that Plaintiffs pointed out in their opening brief that the Government's argument "misstates" the nature of the 1811 New Jersey

15

law as requiring gunpowder manufacturers to acquire a license when, in fact, it merely regulated the locations where factories could be built, *id.* at 38, the Government maintains its previous, inaccurate, characterization, Gov't Br. at 25 n.3.

The Government broadly concludes from these sources: "Congress may impose modest regulations on the ability of an individual to purchase a handgun outside his or her state of residence, particularly since many of the historical examples constituted a complete ban on sales outside the jurisdiction rather than limitations on when and how a buyer might take possession of a purchase." *Id.* at 25. But as just explained, that conclusion is untethered from the actual effect of any of the historical analogues on which it relies, and only the Government's failure to engage with Plaintiffs' arguments allows it to make such a statement.

The Government *does* respond to Plaintiffs on a procedural point. It argues that Plaintiffs have "misappl[ied] the standard the Supreme Court has articulated" by holding the Government to producing a "historical twin" and ignoring that this Court must consider both "how" and "why" a historical law regulated the right to keep and bear arms. *Id.* at 26–27, 30. But it is hard to see how it reaches that criticism, based on

16

what Plaintiffs have actually argued— that these are not close-but-not-quite historical analogues. The majority of the proffered regulations simply had *nothing* to do with "government regulation over the commercial trade in firearms due to concerns that the arms might fall into dangerous hands," which, in turn, defeats any analogy to the Ban even on the Government's own characterization of it as a regulation aimed "[t]o prevent individuals … from evading the laws of their own state." *Id.* at 28.

Finally, the Government cites a handful of other cases in support, but none add anything to its faulty historical narrative. *United States v. Vereen*, 152 F.4th 89 (2d Cir. 2025), resolves a post-*Bruen* challenge to the same law at issue here. In *Vereen*, the Second Circuit essentially adopted the Government's historical story, concluding that "colonial and founding-era state laws regulating the movement of firearms and gunpowder between colonies and across borders" and "contemporaneous statutes disarming those deemed dangerous" supported the Ban. *Id.* at 100. But as Plaintiffs have explained, in fact very few of the colonial laws the Government and the Second Circuit cite on that point actually did restrict trade across borders, and that such restrictions cannot be found

17

at a time period *after* the United States became a cohesive economic and political union renders any analogy inapt anyway. *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017), which the government cites for the proposition that "colonial governments substantially controlled the firearms trade," *id.* at 685, similarly cannot help the Government. *Teixeira* relied on, for that broad statement, many of the same laws Plaintiffs discussed above. *Id.* While those laws may, generally, show that colonial governments exercised regulatory authority over the firearms trade, they do not show any history of interstate firearm transfer restrictions. Neither *United States v. Serrano*, 651 F. Supp.3d 1192 (S.D. Cal. 2023), nor *United States v. Holton*, 639 F. Supp. 3d 704 (N.D. Tex. 2022), add anything material. Both concluded broadly that colonial governments restricted firearms trade, but both did so on the basis of statutes Plaintiffs have shown in detail are not proper analogues for *this* restriction.

## CONCLUSION

The judgment of the district court should be reversed and the case should be remanded with instruction to enter summary judgment in Plaintiffs' favor.

18

Dated: May 27, 2026                     Respectfully submitted,

Cody J. Wisniewski                          s/ David H. Thompson
FPC ACTION FOUNDATION                        David H. Thompson
5550 Painted Mirage Road                    Peter A. Patterson
Suite 320                                   William V. Bergstrom
Las Vegas, Nevada 89149                     COOPER & KIRK, PLLC
Telephone: (615) 955-4306                   1523 New Hampshire Ave., N.W.
Facsimile: (615) 334-0463                   Washington, D.C. 20036
cwi@fpcafhq.org                             Telephone: (202) 220-9600
                                            Facsimile: (202) 220-9601
                                            dthompson@cooperkirk.com
                                            ppatterson@cooperkirk.com
                                            wbergstrom@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

19

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit on May 27, 2026 by using the CM/ECF system and that service was accomplished on all counsel of record by the appellate CM/ECF system.

/s/ David H. Thompson

David H. Thompson

*Counsel for Plaintiffs-Appellants*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 3,761 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Century Schoolbook, 14-point font.

This document complies with the AI usage reporting requirement of 5th Cir. R. 32.3 because no generative artificial intelligence program was used in the drafting of this document.

Dated: May 27, 2026

/s/ David H. Thompson

David H. Thompson

*Counsel for Plaintiffs-Appellants*