# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 18, 2026

Lyle W. Cayce
Clerk

No. 25-11206

Elite Precision Customs L.L.C.; Tim Herron; Freddie Blish; Firearms Policy Coalition, Incorporated, *a nonprofit corporation*,

*Plaintiffs—Appellants*,

*versus*

Bureau of Alcohol, Tobacco, Firearms, and Explosives; Todd Wallace Blanche, *U.S. Attorney General*; Daniel Driscoll, *Acting Director, U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:25-CV-44

Before Smith, Haynes, and Engelhardt, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Plaintiffs unsuccessfully sought a permanent injunction against several provisions of 18 U.S.C. § 922 that collectively prohibit the buying and selling of handguns across state lines. The only issue is whether those provisions are constitutional under the Second Amendment. They are not: Under *Bruen*, they implicate the Second Amendment's plain text, making them pre-

sumptively unconstitutional, and the government has failed to meet its burden to justify the provisions as consistent with the nation's tradition of firearms regulation. We reverse and render judgment for plaintiffs.

I.

There are three provisions within § 922 that regulate the sale and receipt of firearms across state lines. The first, § 922(a)(3), states that "[i]t shall be unlawful … for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides … any firearm purchased or otherwise obtained by such person outside that State[.]" Likewise, the statute contains a parallel prohibition against unlicensed individuals' selling firearms into another state, asserting that "[i]t shall be unlawful … for any [unlicensed] person … to transfer, sell, trade, give, transport, or deliver any firearm to any [unlicensed] person … who the transferor knows or has reasonable cause to believe does not reside in … the State in which the transferor resides[.]" § 922(a)(5).

The third provision applies against licensed dealers of firearms and decrees that "[i]t shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver … any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in … the State in which the licensee's place of business is located[.]" § 922(b)(3). This third provision is subject to carve-outs authorizing "the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States" and "the loan or rental of a firearm to any person for tem-

porary use for lawful sporting purposes[.]" *Id.*[1]

Therefore, the provisions at issue categorically outlaw all direct sales of handguns in interstate commerce, regardless of where the transacting parties happen to be located when the sale is made. As a result, these provisions, when taken together, constitute the Nonresident Handgun Purchase Ban ("the Ban").[2]

Notwithstanding the force of the Ban, though, it is possible for a resident of one state lawfully to obtain a handgun sold by a licensed dealer in another state via a transfer between the originating licensed dealer and an intermediary licensed dealer located in the purchaser's home state. That transfer mechanism, however, is not automatic. Nothing compels a licensed dealer to agree to be a transfer recipient in furtherance of an otherwise unlawful interstate handgun sale, and those licensed dealers who do, in fact, decide to partake in such a scheme in any capacity typically charge a substantial fee. Additionally, transfers of this kind are not instantaneous and usually entail a significant waiting period as the steps of the transfer process are executed.

Plaintiff Elite Precision Customs L.L.C. has averred that it is a federally licensed firearms manufacturer and dealer located in Texas. It has

---

[1] Other than the two exemptions enumerated in § 922(b)(3) regarding on-site sales of long-barreled guns and short-term rentals of firearms, the relevant provisions of § 922 exclude from their ambit only the act of taking possession of an inherited firearm. *See* § 922(a)(3) ("[This section] shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State[.]").

[2] The underlying constitutional challenge also implicates a regulation promulgated by the ATF that closely tracks the terms of the Ban. *See* 27 C.F.R. § 478.99(a). Because that regulation offers nothing of substance that is not covered by the Ban, we need not address it independently.

further sworn that, if not for the Ban, it would sell handguns directly to residents of other states as well. Among Elite Precision's potential out-of-state customers are plaintiffs Freddie Blish and Tim Herron. Both have declared that they are law-abiding citizens who reside in Arizona and New Mexico, respectively, and would purchase handguns directly from Elite Precision but for the Ban. In particular, Herron has attested that he has occasionally acquired handguns from out-of-state licensed dealers through an intermediary licensed dealer that was participating in the requisite transfer process, which dealer "typically charges [him] $30–40 to facilitate the purchase, and the process delays [his] taking possession of the handgun." Furthermore, plaintiff Firearms Policy Coalition is a nonprofit organization that seeks to defend "the inalienable, fundamental, and individual right to keep and bear arms," and counts all three of the aforementioned parties among its members.

Plaintiffs sued for a permanent injunction against enforcement of the Ban on the ground that it violates the Second Amendment. The government filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), while the plaintiffs moved for summary judgment under Federal Rule of Civil Procedure 56. The facts are undisputed, so the district court properly observed that "the determinative inquiry is which [p]arty is entitled to judgment as a matter of law." Indeed, the disposition hinges upon a single pure question of law: Is the Ban constitutional in light of the Second Amendment? The district court answered in the affirmative, granting the government's motion to dismiss and denying plaintiffs' motion for summary judgment. Plaintiffs appeal.

## II.

The test for whether a law unconstitutionally infringes upon the Second Amendment is laid out in *N.Y. State Pistol & Rifle Ass'n v. Bruen*,

597 U.S. 1 (2022). At *Bruen* Step 1, courts must inquire "whether the Second Amendment's plain text covers an individual's conduct," and, if so, then "the Constitution presumptively protects that conduct." *Id.* at 24. At *Bruen* Step 2, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* *Bruen* squarely rejected the applicability of means-end scrutiny in the Second Amendment context and is therefore the only viable way of determining whether an impermissible infringement is afoot.

At *Bruen* Step 2, "considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" centers on an assessment of "[w]hy and how the regulation burdens the right." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). To pass constitutional muster, "[t]he law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). Nevertheless, "[e]ven when a law regulates arms-bearing for a permissible reason, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.*

### A.

The Second Amendment's plain text makes explicit reference only to the "keeping" and "bearing" of arms, but it is well established in the American legal tradition that the right to keep firearms logically entails the right to purchase them as well.[3] This court has recently held as much. *See Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025) ("But the right to 'keep and bear arms' surely implies the right to purchase them."). "The threshold textual

[3] *See, e.g.*, *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them[.]"); *see also Luis v. United States*, 578 U.S. 5, 26 (2016) (THOMAS, J., concurring) ("Constitutional rights ... implicitly protect those closely related acts necessary to their exercise.").

question is not whether the laws and regulations impose reasonable or historically grounded limitations, but whether the Second Amendment 'covers' the conduct (commercial purchases) to begin with … [and] it does." *Id.*

This strikes at the heart of the matter: The Ban, true to its name, categorically bars an entire class of otherwise lawful firearms purchases. The Ban is not a mere stipulation upon an otherwise safeguarded right to purchase firearms in the course of "keeping" them. Rather, the Ban disqualifies all direct handgun purchases across state lines, and there is no such thing as "a purchase ban unknown at the time of the founding that can evade *Bruen* analysis." *Id.* at 590 n.2. Therefore, the Ban must implicate the plain text of the Second Amendment.

The existence of the licensee-to-licensee workaround does not undermine this conclusion. In *Reese*, this court struck down a statute prohibiting federally licensed firearms dealers from selling handguns to individuals between the ages of eighteen and twenty, notwithstanding that they were still permitted to purchase shotguns and rifles from federally licensed dealers, or that the law in question did "nothing to prohibit eighteen-to-twenty-year-olds from owning, possessing, or carrying handguns, [or to] prohibit them from buying handguns in the unlicensed, private market or receiving handguns as gifts." *Id.* at 587. In other words, under *Reese*, regulations restricting firearm purchases need not be fully comprehensive to be correctly characterized as purchase bans.

Relatedly, the degree to which a regulation encroaches upon Second Amendment rights is generally immaterial at *Bruen* Step 1. Conduct either implicates the plain text of the Second Amendment—in which case it is entitled to a presumption of constitutional protections—or it does not—in which event the Second Amendment offers no succor.

There is no middle ground. It is no defense of the Ban's constitution-

ality to theorize that it is only a minor infringement of Second Amendment rights that still "allow[s] ample access to handguns by those who are permitted to possess and purchase them under state and local laws." *Mance v. Sessions*, 896 F.3d 699, 709 (5th Cir. 2018) (per curiam) (rejecting a pre-*Bruen* challenge to the Ban).

This is confirmed by *Wolford v. Lopez*, 146 S. Ct. 2032 (2026). *Wolford* holds that at *Bruen* Step 1, plaintiffs need only demonstrate that the challenged law concerns "the people," that it relates to "any form of 'Arms,'" and, as relevant here, that it "place[s] any restrictions on either the 'keeping' … or the 'bearing' of arms." *Id.* at 2043 (quoting *Bruen*, 597 U.S. at 32–33). Once this showing has been made, the law in question is deemed "presumptively unconstitutional," with no further need for argumentation or negotiation. *Id.* at 2044.

These same principles govern here. It is irrelevant that the Ban does not cover all types of firearms or fails entirely to foreclose all avenues of interstate firearm transfers. The Ban remains a purchase ban even subject to these caveats and thus is fully subject to the Second Amendment. Therefore, the challenge to the Ban survives *Bruen* Step 1, and the district court erred when it held otherwise.

B.

To resist this result, the government, joined by *amici*, makes extensive use of *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024). In *McRorey*, this court considered a Second Amendment challenge to expanded background-check requirements for individuals between the ages of eighteen and twenty; we upheld the regulations. *Id.* at 840. *McRorey* is inapposite, however, for several reasons.

Most importantly, the limitation imposed by the regulation in *McRorey* amounts to nothing more than a modest waiting period of definite length. As

this court observed, under that regulation, "the maximum duration a dealer must wait under the Act while a background check remains pending is ... 10 business days," and this length of time is clearly limited "by operation of law[.]" *Id.* at 839. The regulation, then, does not act to proscribe any firearm purchases whatsoever. After ten business days, it automatically loses all force and no longer operates to delay any transaction that would have been immediately executable in the regulation's absence.

Not so with the Ban. There is no amount of time an individual can wait to be able to purchase a handgun directly from a licensed firearms dealer in another state, because such purchases are flatly illegal. Looking at the face of the Ban alongside the regulation challenged in *McRorey*, they are of two different kinds altogether, such that applying *McRorey* to the Ban would be inappropriate. The regulation in *Reese* is far more analogous to the circumstances of the Ban, and so *Reese*'s line of reasoning is easily preferable.

Second, *McRorey* recognizes that it is impermissible to put firearms-related regulations "toward abusive ends" and that it is equally impermissible to "shoehorn[] restrictions on purchase into functional prohibitions on keeping." *Id.* at 837–38. Yet this is precisely what the Ban does.

Even to the extent that the Ban can be circumvented by the licensee-to-licensee transfer workaround (which vests full veto power over interstate handgun sales in a group of third parties financially dependent on the government's licensing regime), the Ban invariably calls for the payment of a fee over and above the cost of a handgun. We must pause before endorsing a cost attached to the exercise of a fundamental constitutional right.[4] To the extent

[4] *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 244–45 (1936); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966) (striking down poll tax of $1.50); *Boynton v. Kusper*, 494 N.E.2d 135, 141 (Ill. 1986) (striking $10 tax on marriage licenses); *cf. Carey v. Population Servs., Int'l*, 431 U.S. 678, 687, 689 (1977) (striking a state law limiting sale of

that prior decisions from this court hint there is an acceptable cost that may be imposed on the basic exercise of Second Amendment rights, they are abrogated by *Bruen* and its progeny.[5]

Third, *McRorey* starts from the assumption "that background checks preceding firearm sales are presumptively constitutional"; *McRorey* does not assess the constitutionality of the expanded background checks against a blank slate. 99 F.4th at 836 (first citing *Bruen*, 597 U.S. at 38 n.9; and then citing *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008)). At the root of the relevant precedent, *Heller* asserts that it does not "cast doubt on … laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27. Accordingly, in the government's view, the plaintiffs have severely overhyped the Ban, positing that practically any meager condition or qualification on the capacity to purchase a firearm "can be recharacterized as a ban on purchase under certain circumstances."

But the converse is also true. Almost any ban on purchasing firearms under certain circumstances can be recharacterized as merely imposing conditions and qualifications on such purchases. Because it is obvious that neither *Heller* nor its progeny means to vest wide-reaching purchase bans with a presumption of constitutionality, it is equally evident that neither *Heller* nor its progeny blesses the notion that regulations can be routinely upheld under the auspices of garden-variety "conditions and qualifications."

Indeed, in the very same sentence, *Heller* frames its positive treatment

---

contraceptives to licensed pharmacists because "[r]estrictions on the distribution of contraceptives" lessened both consumer choice in where to purchase and "the possibility of price competition").

[5] *See, e.g.*, *Bezet v. United States*, 714 F. App'x 336, 340-41 (5th Cir. 2017) (using means-end scrutiny to uphold a $200 tax on firearms transfers, thereby evincing the holding's incompatibility with the modern *Bruen* framework).

of "conditions and qualifications" in terms of an "historical analysis" intended to validate certain "longstanding prohibitions" applicable in the Second Amendment context. *Id.* At least to some degree, we might view this as a prescient endorsement of the sort of analysis called for at *Bruen* Step 2, rather than as an exhortation to avoid reaching that part of the analysis by being overeager in applying presumptions of constitutionality. *Cf. United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024).

More to the point, though, is the salient fact that *McRorey* concerns background checks, which are the quintessential manifestation of "conditions" that the *Heller* tradition supports.[6] Meanwhile, the Ban is of an entirely different breed and easily lacks the positive jurisprudential pedigree that background checks claim. As a result, nothing in *McRorey* forecloses this challenge to the Ban.

C.

Because the district court decided that the Ban did not implicate the Second Amendment's plain text, it found that the challenge to the Ban failed at *Bruen* Step 1, so it did not reach Step 2. While, under such circumstances, this court could remand for further proceedings regarding *Bruen* Step 2, we retain discretion to "decide[] the case and decline[] to remand when parties [have] proffered sufficient records."[7] Both sides fully briefed their historical arguments in the district court and have renewed those contentions on

---

[6] *See Bruen*, 597 U.S. at 38 n.9 ("[S]hall-issue regimes, which often require applicants to undergo a background check … are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.") (internal quotation omitted).

[7] *United States v. Hembree*, 165 F.4th 909, 913 n.3 (5th Cir. 2026), *petition for cert. filed* (Apr. 24, 2026) (No. 25-1219) (citing *United States v. Morgan*, 147 F.4th 522, 530–31 (5th Cir. 2025), *cert. denied*, 146 S. Ct. 1781 (2026)).

appeal. Especially since there are no factual disputes and all review is strictly *de novo*, this case is now ripe for a decision at *Bruen* Step 2.

D.

To defend the Ban's constitutionality, the government proffers all of the following potential historical analogues: (1) a Connecticut law passed in 1642 banning the sale of firearms by residents to individuals outside the colony; (2) a Connecticut law passed in 1650 banning sales of firearms to "any person inhabiting out[side] of this jurisdiction," largely intended to rectify the 1642 law's failure to keep firearms out of the hands of the Indians; (3) a 1676 Virginia enactment permitting the sale of "arms and ammunition to … loyal subjects inhabiting this colony"; (4) a 1631 Virginia law requiring all newcomers to the colony to be documented, including a record of any arms or ammunition in their possession; (5) a 1720 Virginia statute precluding residents of Spotsylvania and Brunswick Counties from removing government-provided firearms from their respective domiciles; (6) a 1719 South Carolina law proscribing all exports of government-provided firearms; (7) a 1776 Maryland measure proscribing all exports of firearms by any individual not permanently relocating; (8) a New York law enacted in 1652 (when New York was under Dutch rule and called New Amsterdam) completely banning all sales of arms and ammunition, even within the colony; (9) a 1651 Massachusetts law outlawing the unlicensed export of gunpowder; (10) a 1775 Connecticut statute doing the same; (11) a 1795 Pennsylvania enactment requiring all publicly stored gunpowder to be proved and marked; (12) an 1814 Massachusetts law prohibiting the sale of any musket lacking an official mark of approval; (13) an 1821 Maine enactment doing the same; (14) an 1820 New Hampshire law establishing a state gunpowder inspection operation; (15) an 1811 New Jersey law requiring all gunpowder manufacturers to be licensed; (16) a 1763 Pennsylvania statute banning the sale of firearms to Indians; (17) an 1802 Mississippi law doing the same; and (18) an 1815 Illinois law doing

the same.[8]

This prolix list of historical regulations are in three broad categories. *First*, wartime exigencies and essential provisions for the common defense. Many of the laws were enacted when the colonies were fighting a foreign enemy or at least were subject to circumstances that presented an unusually high risk of physical harm befalling one settlement or another, such that it became necessary to restrict the flow of firearms to avoid becoming defenseless.

Item 3 belongs here, given that the emphasis in the statute is best placed on "loyal" rather than on "this colony," because the law in question was enacted just one year hence from Bacon's Rebellion. The "why" of this law relates to mitigating the prospect of future uprisings instead of a particular desire to insulate other colonies from the effects of the Virginia arms trade. Items 5 and 6 belong here too, since their scope was limited to those weapons made available to citizens by colonial officials seeking to establish appropriate defensive measures, and these laws did not attempt to control the private trade of arms and ammunition. Items 7 and 10 go here as well, since their passage dates of 1776 and 1775, respectively, show that they were measures designed to facilitate the prosecution of the Revolutionary War.

*Second*, regulation of commerce with foreign sovereigns. Aside from independent nation states as they are recognized in the modern day, foreign sovereigns before the time of the founding frequently included the other colonies. The further back in history we look, the more independent each colony was, and the less likely that the sale of firearms outside the colony's borders would have been viewed any differently from the sale of firearms to an

[8] *Amici* support the government's position but offer no historical laws other than those already cited.

entirely distinct country. Additionally, the same goes for the Indian tribes, which were considered as separate sovereigns capable of entering into treaties on par with the government, both at the founding and long thereafter. We need not recount the development and contours of federal Indian law; it is sufficient to say that commerce between American citizens and tribal members was approached quite differently from how the concept of interstate commerce was understood in and around 1791.[9]

Items 1 and 2 neatly slot into this category, to the extent that they are even relevant given how significantly they predate the ratification of the Second Amendment.[10] Items 16 through 18 belong here as well, given the general status of the Indian tribes along what constituted the nation's western frontier in the early nineteenth century.

*Third*, prototypes of consumer protection statutes. While a far cry from modern statutory regimes, the historical laws falling into this category usually sought to inspect the quality of arms and ammunition, to implement minimum mandatory standards for newly manufactured arms and ammunition, to prevent the theft of arms and ammunition held in public trust, and generally to keep abreast of trends in the supply of and market for arms and ammunition. Laws fitting into this category do not aim to prevent sales to any particular class of individual, but rather are exclusively concerned with the nature of the product on offer. Items 4 (neutral recordkeeping), 9 (licensing scheme designed to ensure exported powder is lawfully owned by its possessor, rather than to prohibit export in general), and 11 through 15 (various

---

[9] *Cf.* U.S. CONST. art. I, § 8, cl. 3 (distinguishing between "Commerce … among the several States, and with the Indian Tribes").

[10] *See* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, HARV. J.L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://perma.cc/F98Y-3D32.

regulatory regimes aimed at quality control and preventing the sale of defective arms and ammunition) all fit this bill.

Only one law remains outstanding, namely item 8 in the foregoing list, and it generally lacks probative value in this inquiry. Most glaringly, it was enacted at a time when New York was still a Dutch holding, which thus exempts the law from the English common law tradition that ultimately gave rise to the Bill of Rights and the Second Amendment in particular. Beyond this, the full text of this law has been lost to history. It is ambitious at best to say that a law can be an historical analogue capable of justifying a modern regulation when we do not know for sure what the law proscribed or how it was enforced.[11]

At bottom, the government's theory of the Ban's historical justification centers on its contention that "when it enacted the Omnibus Crime Control Act and the Gun Control Act of 1968 [which contains all of the provisions comprising the Ban], Congress sought to address concerns about public safety and that individuals deemed dangerous might evade state laws designed to ensure only law-abiding citizens could acquire firearms by purchasing them outside the jurisdiction." In other words, the "why" that the government seeks to find in the historical record is peacetime protection of the public from violent criminals, and the "how" that the government would have us identify is comity among all the jurisdictions within a single sovereign. On that account, the government's proffer, though reflecting impressive historical research, falls well short of the mark. None of the three categories elucidated above as actually present in the historical record—provisions for the common defense, regulations of foreign commerce, and

[11] *See Nguyen v. Bonta*, 140 F.4th 1237, 1246 n.4 (9th Cir. 2025) ("Because the exact text of this law is unavailable, we are unable to determine if this is a sufficient historical analogue.").

consumer protection—meaningfully align with the tale that the government is trying to tell on this subject.

The only plausible way to reconcile the government's view with the historical record is to read early laws restricting cross-border firearms sales at an extremely high level of generality, without regard to the significant differences between state borders and national borders, and also without recognizing that the historical record is devoid of laws meaningfully restricting the trade of firearms between states in the time soon after the United States became established as a single, cohesive entity. That was precisely the Second Circuit's misdirection in rejecting a challenge to the Ban functionally identical to the one presented here. *See United States v. Vereen*, 152 F.4th 89, 100 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 1519 (2026) (determining that the historical record was adequate to justify the Ban because "colonial and founding-era state laws regulating the movement of firearms and gunpowder between colonies and across borders ... satisfy the 'how' and the 'why' inquiries under *Bruen*").

We reject the Second Circuit's approach. That distinguished court's questionable analysis stretches the historical record far beyond what it can actually bear. Broad similarities between historical precedents and modern regulations are insufficient at *Bruen* Step 2, and the Supreme Court helpfully drove this point home in *United States v. Hemani*, 146 S. Ct. 1677 (2026).

*Hemani* barred the use of founding-era laws disarming "habitual drunkards" to support the use of a modern statute to disarm a present-day marihuana smoker, on the ground that the historical analogues "targeted different kinds of people, did so for different purposes, and operated in different ways" from how the modern regulation functions. *Id.* at 1687. Applying that lesson here, the finer points of the historical record cannot be glossed over, such that merely observing the general capacity of colonial govern-

ments to regulate the firearms trade is inadequate to justify the Ban under the Second Amendment. A more nuanced approach at a lower level of generality is required, and, under that standard, founding-era laws regulating the sale of arms and ammunition are inapposite to modern-day prohibitions of interstate handgun sales and transfers.

Thus, the government has failed to carry its burden at *Bruen* Step 2, and the Ban lacks adequate historical justification.

* * * * *

The Ban sullies the plain text of the Second Amendment and is inconsistent with the nation's tradition of firearms regulation, dating back to the founding era, under that Amendment. The judgment of dismissal is REVERSED, and judgment is RENDERED for the plaintiffs.

HAYNES, *Circuit Judge*, dissenting:

I respect the majority opinion, but I respectfully dissent. I agree with the district court's decision that the several provisions of 18 U.S.C. § 922 discussed in this case are not unconstitutional under the Second Amendment. That is all that is in play in this case, thus, I would affirm.